*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SHAWN MURPHY, ) | |
| ) | Supreme Court No. S-17530 |
| Appellant, ) | |
| ) | Alaska Workers' Compensation |
| v. ) | Appeals Commission No. 18-008 |
| ) | |
| FAIRBANKS NORTH STAR ) | O P I N I O N |
| BOROUGH, ) | |
| ) | No.7555 – September 3, 2021 |
| Appellee. ) | |
| ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Andrew D. Wilson, Rehbock & Wilson, Anchorage, for Appellant. Zane D. Wilson, CSG, Inc., Fairbanks, and Wendy Dau, Fairbanks North Star Borough, Fairbanks, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

## I.  INTRODUCTION

The Alaska Workers' Compensation Act has long applied a two-year

limitations period to claims for "compensation for disability."[1] In 1988 the legislature reconfigured one type of compensation — for permanent partial disability — as compensation for permanent partial impairment. The claimant argues that this amendment exempted claims for impairment compensation from the statute of limitations. We disagree. Because the statutory text contains ambiguity and the legislative history evinces no intent to exempt impairment claims from the statute of limitations, we rule that claims for impairment compensation are subject to the Act's two-year limitations period.

A secondary issue in this case is whether the Alaska Workers' Compensation Board properly denied paralegal costs for work related to other claims. The applicable regulation requires a claim for paralegal costs be supported by the paralegal's own affidavit attesting to the work performed.[2] We reject the claimant's argument that this regulation is contrary to statute and the constitution.

## II.    FACTS AND PROCEEDINGS

### A.    Murphy's Injury And Early Compensation Claims

In 1998 Shawn Murphy injured his back while working as a mechanic for the Fairbanks North Star Borough.[3] The Borough began paying Murphy temporary total disability benefits effective from the date of the injury. After a referral from a Fairbanks physician, Murphy went to California for surgeries related to this injury in 1998 and 1999.

Murphy was found eligible for reemployment benefits in September 1999 after his surgeon, Dr. Noel Goldthwaite, concluded Murphy would not have the physical

---

[1]    AS 23.30.105(a).

[2]    8 Alaska Administrative Code (AAC) 45.180(f)(14) (2011).

[3]    He had previously injured it in 1995.

capacities to return to work as a mechanic.[4] The parties partially settled reemployment benefits, with the Borough paying Murphy a flat sum for costs related to a degree program at the University of Alaska. When Murphy began taking classes, he was not medically stable[5] and continued to receive temporary total disability compensation.[6] The partial settlement did not discuss stipend payments under AS 23.30.041(k) that may be available to injured workers during reemployment, nor did it address other types of compensation.

According to a compensation report[7] the Borough filed with the Board,

---

[4] Reemployment benefits are meant to ensure that injured employees who cannot return to their former jobs acquire skills that enable them to "earn a living after an injury." *Arnesen v. Anchorage Refuse, Inc.*, 925 P.2d 661, 665 (Alaska 1996).

[5] AS 23.30.395(28) defines "medical stability" as follows:

the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment, notwithstanding the possible need for additional medical care or the possibility of improvement or deterioration resulting from the passage of time; medical stability shall be presumed in the absence of objectively measurable improvement for a period of 45 days; this presumption may be rebutted by clear and convincing evidence[.]

[6] *See* former AS 23.30.041(k) (1996) (providing that temporary total disability compensation ends if employee "reaches medical stability before completion of the plan"). We apply the version of the Act in effect at the time of Murphy's injury. *See Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 209 (Alaska 2014) ("In general the statute in effect on the date of injury applies to a workers' compensation claim.").

[7] The Act formerly required an employer to notify both the Board and the employee about certain changes in compensation payment "on a form prescribed by the [B]oard." Former AS 23.30.155(c) (1996). The form used in this case included

(continued...)

Murphy began receiving permanent partial impairment benefits instead of temporary total disability benefits in September 2000, after Dr. Goldthwaite concluded Murphy was medically stable. Dr. Goldthwaite prepared his permanent partial impairment rating report in February 2001. Using the Fourth Edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment (the AMA Guides), the reference required by statute, Dr. Goldthwaite rated Murphy as having a 30% whole person impairment. The Borough did not controvert or otherwise question Dr. Goldthwaite's rating.

Dr. Richard Cobden in Fairbanks then began treating Murphy for his injury. In March 2001 Dr. Cobden concurred with Dr. Goldthwaite's earlier rating, but Dr. Cobden told Murphy to return to discuss some issues "before this report is finalized." In April 2001 Dr. Cobden noted that Murphy had "gradually improved," suggesting that up to that time Murphy may not have been medically stable, and that his impairment was then "ready for documentation." Dr. Cobden rated Murphy as having a 23% whole person impairment using the Fifth Edition of the AMA Guides, which the Board had adopted as the updated statutory reference effective February 28, 2001. The Borough did not controvert Dr. Cobden's rating.

In June 2001 the Borough filed a compensation report with the Board showing a change from permanent partial impairment benefits to reemployment stipend benefits.[8] The report left blank the form's section related to the impairment rating and

---

[7]    (...continued)
information specific to impairment benefits and also warned employees in bold-face type that they had two years from the date of the compensation report to file a written claim for additional compensation payments.

[8]    *See* former AS 23.30.041(k) (1996) (providing that if "employee's permanent impairment benefits are exhausted before the completion or termination of the
(continued...)

the total impairment compensation due; the boxes to indicate whether impairment benefits had been paid as a lump sum or in installments were also blank.[9] The June 2001 report indicated the Borough had paid $20,963.38 in impairment benefits.

In a letter dated August 29, 2001, a Board employee asked the Borough to "complete [the report] with the [permanent partial impairment] rating" because "[t]he total [impairment benefit] paid does not seem to relate to a [permanent partial impairment] percentage."[10] The Borough responded with an undated handwritten note on the Board's letter showing calculations based on a 13% rating. This 13% figure indicated the Borough used Dr. Cobden's impairment rating of 23%, adjusted for Murphy's preexisting 10% impairment from his previous injury.[11] A "corrected" June 2001 compensation report with similar information is in the record with no stamp showing when it was filed with the Board. Both the letter with the adjuster's handwritten note and the corrected compensation report have a May 2, 2002 fax stamp at the bottom. The "corrected" compensation report said Murphy had a 13% impairment, which equaled

---

[8]      (...continued)
reemployment process, the employer shall provide wages" in an amount detailed therein).

[9]      Murphy later argued that these blanks in the compensation reports impeded him from realizing that he was owed additional impairment compensation, justifying the delay in filing his claim for additional compensation.

[10]      The amount of permanent partial impairment compensation is a sum set out in the statute "multiplied by the employee's percentage of permanent impairment of the whole person." AS 23.30.190(a). At the time Murphy was injured, the statutory amount was $135,000. Former AS 23.30.190(a) (1996). The legislature increased the statutory amount in 2000. Ch. 105, § 17, SLA 2000.

[11]      AS 23.30.190(c) ("The impairment rating determined under (a) of this section shall be reduced by a permanent impairment that existed before the compensable injury.").

$17,550, as total impairment benefits. The amount of impairment benefits listed in the payment section remained unchanged, but a handwritten remark indicated an impairment-benefits-related overpayment had been deducted from ongoing reemployment stipend payments. The corrected compensation report continued to show a change from temporary total disability to impairment benefits in September 2000.

The Borough's final compensation report in December 2001 left blank the questions related to the percentage of impairment and the way it was paid. Like the original June 2001 report, the December report showed that temporary total disability ended in September 2000, that impairment benefits of $20,963.38 were paid, and that reemployment stipend benefits began in May 2001. Murphy did not file a written claim for additional impairment benefits at that time.

### B. Murphy's 2017 Claim For Additional Impairment Compensation

After finishing his retraining, Murphy worked as a computer technician and continued to have follow-up care for his back over the years. The Borough in 2016 controverted any care that exceeded statutory frequency standards.

An attorney entered an appearance on Murphy's behalf in 2016, and in early 2017 Murphy filed a written workers' compensation claim. The claim included a request for additional impairment compensation, alleging the "full rating was not paid" and that the employer "paid [impairment benefits] according to the wrong AMA Guides edition." The Borough's answer denied all claims. It also asserted that the claim for additional impairment compensation was barred by the statute of limitations in AS 23.30.105.[12] The parties settled several of the disputes in mediation but did not

---

[12] At the time of Murphy's injury AS 23.30.105(a) provided:

The right to compensation for disability under this chapter is barred unless a claim for it is filed within two years after the

(continued...)

resolve the issue of impairment compensation, which proceeded to hearing.

In his pre-hearing brief, Murphy argued that AS 23.30.105(a)'s two-year limitations period does not apply to claims for impairment compensation. Noting that the statute provides that the "right to compensation for disability . . . is barred unless a claim for it is filed within two years" and that this court's decisions have drawn a distinction between compensation for "disability" and compensation for "impairment,"[13] Murphy argued that his impairment claims were not subject to the limitations period.

Hearing testimony relevant to the impairment claim addressed the two different impairment ratings: Dr. Cobden's and Dr. Goldthwaite's. The Borough presented testimony from two adjusters: Melody Kokrine, who worked on the claim in 2000 and 2001, and Nichole Hanson, who was then working on it. Kokrine remembered

---

[12] (...continued)
employee has knowledge of the nature of the employee's disability and its relation to the employment and after disablement. However, the maximum time for filing the claim in any event other than arising out of an occupational disease shall be four years from the date of injury, and the right to compensation for death is barred unless a claim therefor is filed within one year after the death, except that, if payment of compensation has been made without an award on account of the injury or death, a claim may be filed within two years after the date of the last payment of benefits under AS 23.30.180, 23.30.185, 23.30.190, 23.30.200, or 23.30.215. It is additionally provided that, in the case of latent defects pertinent to and causing compensable disability, the injured employee has full right to claim as shall be determined by the board, time limitations notwithstanding.

[13] *See, e.g.*, *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1125-27 (Alaska 2017) (emphasizing distinction between permanent partial *disability* and permanent partial *impairment* for purposes of offsetting benefits received against compensation for permanent total disability).

little about adjusting the claim but indicated she probably used the later rating because Dr. Cobden noted that Murphy had improved. Hanson testified that had she been the adjuster in 2000, she would have considered the second rating "a correction or amendment to the previous rating." On cross-examination Hanson said she thought the second rating was "correct" because it was done by a Fairbanks physician (Dr. Cobden) who in her view was "more familiar" with Murphy. But she stated that typically she would use the later date for medical stability if doctors disagreed about the date of medical stability. Murphy did not testify at the hearing.

In closing Murphy argued that the Borough erred by pairing Dr. Goldthwaite's date of medical stability with Dr. Cobden's impairment rating and contended that the Borough had underpaid his impairment benefits. Murphy reiterated that AS 23.30.105(a) did not apply to his impairment claim and argued that even if it did, his claim was timely because the two-year period did not begin to run until 2016, when he retained an attorney and learned of the alleged error in impairment payment. The Borough disagreed, arguing that the statute of limitations applies to impairment claims and that Murphy knew enough in 2001 to inquire about the amount paid because his doctors gave two different impairment ratings.

The Board decided that AS 23.30.105(a) barred Murphy's impairment claim. The Board noted that the legislature in 1988 revised AS 23.30.190 by redefining compensation for permanent partial disability as compensation for permanent partial impairment. The Board then observed that AS 23.30.105(a)'s limitations period had long applied to permanent partial disability claims (a species of "compensation for disability") and that the legislature inserted an express reference to AS 23.30.190 (formerly permanent partial disability, now permanent partial impairment) in AS 23.30.105(a) to provide that voluntary payment of impairment benefits tolls the limitations period for a compensation claim. In light of these amendments, the Board

concluded that the legislature "intended to continue application of the two-year limitation period to the newly re-defined benefit."

The Board then reviewed arguments and evidence that the claim was stale and should be barred, including Kokrine's testimony suggesting she had no real memory of the details of the claim. The Board wrote that it was "eminently [sic] clear to anyone" that Dr. Cobden's 23% impairment rating "represents a lesser benefit" than Dr. Goldthwaite's 30% rating, putting Murphy on notice that he "should have sought assistance in determining which of the two was . . . 'correct.' " The Board decided the Borough had been prejudiced by the long delay and denied the claim.

In calculating Murphy's costs and attorney's fees related to other issues, the Board disallowed $993.75 in paralegal costs. The paralegal time was documented in Murphy's attorney's billing records, with no affidavits from the two paralegals who did the work. The Board refused to award this cost because its regulation requires an affidavit by the paralegal itemizing the services performed.[14]

C.    **Murphy's Administrative Appeal**

Murphy appealed to the Alaska Workers' Compensation Appeals Commission, which affirmed the Board's decision.[15] The Commission first discussed AS 23.30.105(a)'s application to the case. The Commission acknowledged that the first sentence describes a limitations period for claims for "compensation for disability" and that disability and impairment are distinct forms of compensation. But like the Board,

---

[14]    8 AAC 45.180(f) includes "fees for the services of a paralegal or law clerk" in the costs the Board may award, but these costs may be awarded "only if the paralegal . . . files an affidavit itemizing the services performed and the time spent in performing each service." 8 AAC 45.180(f)(14)(D).

[15]    The Borough cross-appealed to the Commission the Board's decision on attorney's fees, but it did not cross-appeal to this court the Commission's decision affirming the Board.

the Commission emphasized the express inclusion of the impairment compensation statute (AS 23.30.190) in the second sentence. It reasoned that "[e]ven if [use of the term] disability in the first sentence would not limit the time for filing a claim for [impairment] benefits, the next sentence expressly limits such a claim to the necessity of being filed within two years of the last payment of [impairment] benefits."

The Commission next determined when the two-year limitations period began to run. Because the Borough voluntarily paid impairment benefits in installments, and because the compensation reports showed that the Borough replaced Murphy's impairment benefits with reemployment stipend benefits in June 2001, the Commission decided the limitations period for Murphy's claim for increased impairment benefits began running at that time. The Commission said Murphy knew or should have known "when he received his last [impairment] payment that there might be a question as to the proper amount of [impairment benefits] owed to him." Because he did not file his claim for increased impairment until 2017, the statute of limitations barred the claim.

The Commission rejected Murphy's challenge to the Board's regulation on paralegal costs. Murphy had argued that the regulation was invalid because requiring a paralegal to independently document the services provided requires the paralegal to attest to unauthorized practice of law.[16] The Commission disagreed. Observing that Murphy's attorney supervised the paralegals, the Commission reasoned that a paralegal's affidavit documenting activities performed at the direction of an attorney neither attests to the practice of law nor represents that the paralegal is an attorney.

Murphy appeals.

## III.   STANDARD OF REVIEW

"In an appeal from the Alaska Workers' Compensation Appeals

---

[16]     *See* Alaska Bar R. 63 (defining unauthorized practice of law).

-10-                                                    **7555**

Commission, we review the Commission's decision rather than the Board's . . . ."[17] We apply our independent judgment to questions of constitutional law as well as "to questions of 'statutory interpretation requiring the application and analysis of various canons of statutory construction.' "[18] "We exercise our independent judgment in determining the validity of an administrative regulation."[19] "Regulations are presumptively valid and will be upheld as long as they are 'consistent with and reasonably necessary to implement the statutes authorizing [their] adoption.' "[20]

## IV. DISCUSSION

### A. Alaska Statute 23.30.105(a)'s Two-Year Limitations Period Applies To Claims For Impairment Benefits.

To decide whether Murphy's claim for impairment benefits is timely, we must first interpret AS 23.30.105(a), a statute of limitations for certain compensation claims.[21] When Murphy was injured, the statute provided that "[t]he right to

---

[17] *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014).

[18] *Burke v. Raven Elec., Inc.*, 420 P.3d 1196, 1202 (Alaska 2018) (quoting *ARCTEC Servs. v. Cummings*, 295 P.3d 916, 920 (Alaska 2013)).

[19] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017) (quoting *Lauth v. State*, 12 P.3d 181, 184 (Alaska 2000)).

[20] *State, Bd. of Marine Pilots v. Renwick*, 936 P.2d 526, 531 (Alaska 1997) (alteration in original) (citation omitted) (quoting *Chevron U.S.A. v. LeResche*, 663 P.2d 923, 927 (Alaska 1983)).

[21] Claims for medical treatment are governed by a different limitations framework. AS 23.30.095(a); *see also Egemo v. Egemo Constr. Co.*, 998 P.2d 434, 440 (Alaska 2000) ("[N]ew medical treatment entitles a worker to restart the statute of limitations for medical benefits."). New medical treatment that results in wage loss allows a new disability claim that restarts the statute of limitations in AS 23.30.105(a).

(continued...)

-11- **7555**

compensation for disability under this chapter is barred unless a claim for it is filed within two years" of the employee learning of the injury and its relation to employment.[22] Relying on our decision in *Alaska Airlines, Inc. v. Darrow*, which distinguished between compensation for "disability" and compensation for "impairment,"[23] Murphy contends that the statute places a limitation on disability claims only, not impairment claims. Impairment claims, he argues, are not subject to any limitations period. We disagree. Considering the statutory text in its entirety, the legislative history, and the policies underlying the Act, we conclude that the legislature intended the limitations period in AS 23.30.105(a) to apply to impairment claims, just as it applies to claims for other "indemnity benefits" — cash benefits that compensate employees for losses and expenses other than the cost of medical treatment.[24]

        "The goal of statutory construction is to give effect to the legislature's

---

    [21]    (...continued)
*Id.* at 439. Murphy did not allege that his claim for increased impairment compensation was related to new medical treatment; it was based solely on an alleged rating error in 2001.

    [22]    Former AS 23.30.105(a) (1996). In 2000 the legislature amended AS 23.30.105(a), effective July 1, 2000, to include AS 23.30.041. Ch. 105, §§ 10, 23, SLA 2000.

    [23]    403 P.3d at 1126.

    [24]    *See Harris v. Millennium Hotel*, 330 P.3d 330, 336 (Alaska 2014) ("Death benefits are one type of indemnity benefits."); *see also* AS 23.30.001(1) (expressing legislative intent that the Act be interpreted "to ensure the quick, efficient, fair, and predictable delivery of *indemnity* and *medical* benefits to injured workers at a reasonable cost to the employers . . . subject to [it]" (emphasis added)); ch. 79, § 1, SLA 1988 (expressing same legislative intent, without codification).

intent, with due regard for the meaning the statutory language conveys to others."[25] "We interpret a statute 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.' "[26] We do not strictly apply the plain meaning rule but construe statutes using a sliding scale approach, under which "[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[27]

### 1. The statutory text is ambiguous.

In analyzing the text of AS 23.30.105(a) at the time of Murphy's injury, we focus in particular on two portions of the statute. The first key portion describes a limitations period: "The right to compensation for disability under this chapter is barred unless a claim for it is filed within two years after the employee has knowledge of the nature of the employee's disability and its relation to the employment and after disablement."[28] The second key portion tolls the limitations period for a compensation claim so long as the employer voluntarily pays benefits: "[I]f payment of compensation has been made without an award on account of the injury or death, a claim may be filed within two years after the date of the last payment of benefits under AS 23.30.180,

---

[25]     *City of Valdez v. State*, 372 P.3d 240, 254 (Alaska 2016) (quoting *City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1178 (Alaska 1998)).

[26]     *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016) (quoting *Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014)).

[27]     *Gov't Emps. Ins. Co. v. Graham-Gonzalez*, 107 P.3d 279, 284 (Alaska 2005).

[28]     Former AS 23.30.105(a) (1996).

23.30.185, 23.30.190, 23.30.200, or 23.30.215."[29]  The statutes cited in the tolling portion pertain to various types of indemnity benefits:  permanent total disability,[30] temporary total disability,[31] permanent partial impairment,[32] temporary partial disability,[33] and death benefits.[34]

Reading the first part of this statute in isolation tends to support Murphy's argument that only claims for disability, and not claims for impairment, are subject to the two-year limitations period.  The Act specifically defines the terms "compensation" and "disability."  "Compensation" is "the money allowance payable to an employee or the dependents of the employee as provided for in this chapter."[35]  "Disability" means "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment."[36]  When a statute's terms have a legislative definition, we must construe them according to their "peculiar and appropriate meaning"[37] unless doing so "would be inconsistent with the manifest intent of the

---

[29]     *Id.*

[30]     AS 23.30.180.

[31]     AS 23.30.185.

[32]     AS 23.30.190.

[33]     AS 23.30.200.

[34]     AS 23.30.215.

[35]     AS 23.30.395(12).

[36]     AS 23.30.395(16).

[37]     AS 01.10.040.

legislature."[38] And as Murphy correctly points out, we have repeatedly recognized that compensation for "disability" and compensation for "impairment" are different kinds of benefits.[39] Accordingly the plain text of the first sentence of AS 23.30.105(a) suggests that the limitations period does not apply to impairment claims.

But we do not read portions of a statute in isolation. "[W]hen construing a statute, 'we must, whenever possible, interpret each part or section of a statute with every other part or section, so as to create a harmonious whole.' "[40]

The express mention of impairment benefits in the tolling portion casts doubt on the otherwise plain language of the first portion. The tolling portion of the statute provides that if the employer voluntarily pays compensation of various types — including impairment benefits — then "a claim may be filed within two years" after the last voluntary payment.[41] In other words, voluntary payment of impairment benefits tolls the limitations period for a claim. However, the statute does not specify the type of claim for which the limitations period is tolled.

The most natural reading (from a purely grammatical perspective) is that the "claim" for which the limitations period is tolled is the same claim described in the first portion of the statute: a claim for "compensation for disability" and "compensation

---

[38] AS 01.10.020.

[39] *See Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1125-30 (Alaska 2017) (distinguishing "impairment" from "disability" when construing AS 23.30.180 and AS 23.30.190); *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 529-31 (Alaska 1993); *see also Unisea, Inc. v. Morales de Lopez*, 435 P.3d 961, 973-74 (Alaska 2019) (distinguishing between impairment and disability in context of temporary total disability benefits).

[40] *Darrow*, 403 P.3d at 1127 (quoting *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007)).

[41] AS 23.30.105(a).

for death." But that reading produces an anomalous result: an impairment benefits claim is not subject to any limitations period, but voluntary payment of impairment benefits tolls the limitations period for a disability benefits claim. It is hard to make sense of that policy, which implies that the legislature believed impairment benefits to be so distinct from disability benefits as to not warrant the same limitations period, while also believing these benefits similar enough that voluntary payment of one justifies tolling the limitations period for the other.

This incongruity suggests a different reading:[42] that the legislature included impairment benefits in the tolling portion of the limitations statute because it believed impairment claims are themselves subject to the limitations statute. In other words, although the text of the limitations statute refers to claims of "compensation for disability," the legislature believed this phrase includes impairment compensation too.

Had the legislature intended the limitations period to apply to compensation for impairment as well as "compensation for disability," wouldn't it have said so? Maybe not. Although parts of the Act clearly distinguish "disability" from "impairment," in other parts it is not so clear that the legislature intended the term "disability" to exclude impairment. In *Alaska Airlines, Inc. v. Darrow* we considered whether permanent total disability benefits may be reduced by the amount of permanent partial impairment benefits previously paid to the employee.[43] We looked to the 1988 amendments to the Act, in which the legislature made two significant changes: (1) it replaced permanent partial disability benefits with permanent partial impairment benefits; and (2) it added a provision requiring that an award of permanent total disability benefits

---

[42]     *See Fed. Deposit Ins. Corp. v. Laidlaw Transit, Inc.*, 21 P.3d 344, 351 (Alaska 2001) ("[E]ven when a statute's language meaning seems plain on its face, ambiguity may arise if applying that meaning would yield anomalous consequences.").

[43]     403 P.3d at 1125-31.

be offset by any permanent partial disability benefits awarded.[44] Yet under the plain language of the revised statute, which applied only to future compensation awards, an offset would never occur because permanent partial disability benefits would no longer be awarded.[45] We recognized the possibility that the legislature may have "meant to say permanent partial impairment instead of permanent partial disability" and consulted the legislative history for clues, but in the end were unable to discern the legislature's intent.[46]

Here is another example. A key component of the Act is the rebuttable presumption of coverage, which now provides that "compensation or benefits are payable under this chapter for disability or death or the need for medical treatment . . . if the disability or death or the employee's need for medical treatment arose out of and in the course of the employment."[47] The rebuttable presumption requires the Board to "evaluate the relative contribution of different causes" and award compensation "if, in relation to other causes, the employment is the substantial cause of the disability or death or need for medical treatment."[48] The statute does not mention impairment, and the impairment statute contains no comparable eligibility standard.[49] Yet it seems doubtful that the legislature intended to exclude impairment claims entirely from the coverage presumption. Although this statutory language was added in 2005 and does not directly

---

[44] *Id.* at 1126.

[45] *Id.* at 1129.

[46] *Id.* at 1129-31.

[47] AS 23.30.010(a).

[48] *Id.*

[49] *Compare id.*, *with* AS 23.30.190.

shed light on the intent of the legislature that revised AS 23.30.105(a) years earlier, the persistent ambiguity over decades in the way the term "disability" is used notwithstanding its statutory definition is hard to ignore.[50]

In the end, the statutory text does not clearly indicate whether the legislature intended to exempt impairment claims from the two-year limitations period.

### 2. Legislative history suggests an intent to subject impairment claims to a limitations period.

"When statutory language is ambiguous, we look to the purpose of the legislation and the legislative history for indications of legislative intent."[51] The version of AS 23.30.105(a) in effect at the time of Murphy's injury was adopted in 1988.[52] That year, the legislature revised both AS 23.30.105(a) and AS 23.30.190. In revising the latter statute, the legislature redefined permanent partial *disability*, which was tied to the employee's ability to earn a living, as permanent partial *impairment*, which is tied to the

---

[50] The same ambiguity sometimes exists with the term "compensation," which like "disability" has a statutory definition. "Compensation" is "the money allowance payable to an employee or the dependents of the employee as provided for in this chapter." AS 23.30.395(12). However, we have noted that "compensation" has at times been used in the Act "so that the only reasonable reading of the word would include medical benefits," not just money. *Williams v. Safeway Stores*, 525 P.2d 1087, 1089 n.6 (Alaska 1974) (citing AS 23.30.045(a) and former AS 23.30.010). For example, AS 23.30.045, both at the time of Murphy's injury and today, describes in subsection (a) the employer's general duty to pay compensation of various types, including medical benefits, and then in subsection (b) states that "[c]ompensation is payable irrespective of fault as a cause for the injury" without reference to specific types of benefits. Former AS 23.30.045 (1996); AS 23.30.045. It seems doubtful that the legislature intended to exclude medical benefits from the Act's no-fault rule.

[51] *Municipality of Anchorage v. Adamson*, 301 P.3d 569, 576-77 (Alaska 2013) (citing *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003)).

[52] *Compare* former AS 23.30.105(a) (1996), *with* ch. 79, § 19, SLA 1988.

-18- **7555**

employee's "absolute physical capacity."[53]  Claims for permanent partial disability had been subject to the two-year limitations period in AS 23.30.105(a) because permanent partial disability is a type of "compensation for disability."  The question for our purposes is whether the legislature intended to *remove* this benefit, now defined in terms of impairment, from the limitations statute.

There is no hint of such intent in the legislative history.  Instead, the legislature's intent for the limitations statute was entirely different:  to clarify what types of compensation *toll* the limitations period.  The legislature amended the tolling portion of AS 23.30.105(a) to add a list of statutory sections that correspond to certain workers' compensation benefits:  "a claim may be filed within two years after the date of the last payment *of benefits under AS 23.30.180, 23.30.185, 23.30.190, 23.30.200, or 23.30.215*."[54]  The statutory sections in the list correspond to money benefits available to claimants:  permanent total disability (AS 23.30.180); temporary total disability (AS 23.30.185); permanent partial impairment[55] (AS 23.30.190); temporary partial disability (AS 23.30.200); and death benefits (AS 23.30.215).

The legislature's express purpose in adding this list was to answer in part the question we posed in *Williams v. Safeway Stores*:[56]  whether "compensation"

---

[53]  *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1128-30 (Alaska 2017).

[54]  Ch. 79, § 19, SLA 1988 (revised portion italicized).

[55]  The amendment to AS 23.30.105(a) applied "only to injuries sustained on or after July 1, 1988," so it could apply only to claims for impairment benefits.  Ch. 79, §§ 19, 34, 48, SLA 1988.

[56]  525 P.2d 1087, 1089 n.6 (Alaska 1974).

included medical benefits.[57] The legislature sought to "codif[y] the [B]oard's interpretation of the meaning of compensation for statute of limitation purposes under AS 23.30.105."[58] According to the House Judiciary Committee's Sectional Analysis, the Board had "consistently concluded that when compensation payments have been made without an award, the claim must be filed within two years after the last payment of disability or death benefits and cannot be extended by medical benefits only."[59] The most obvious way to interpret this comment is that the legislature's statutory list was meant to distinguish indemnity benefits from medical benefits. Even if impairment benefits are not "disability compensation," as "disability" is defined in the Act,[60] impairment benefits are a form of indemnity compensation. The list of inserted sections contained all of the statutory sections then corresponding to indemnity compensation, including AS 23.30.215, which governs death benefits.[61] This history suggests the

---

[57] H. Judiciary Comm., Sectional Analysis of House Committee Substitute for Committee Substitute For Senate Bill 322 (L&C), 15th Legis., 2d Sess., at 8 (Apr. 6, 1988), *in* PAT WILSON, ALASKA LEGISLATIVE HISTORY: WORKERS' COMP. S.B. 322 (1988) (compiled 1993).

[58] *Id.*

[59] *Id.*

[60] AS 23.30.395(16) (defining "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment").

[61] The list does not include reemployment stipend benefits, which were added to the reemployment benefits statute, AS 23.30.041, in 1988. Ch. 79, § 10, SLA 1988. Yet the legislature defined the stipend benefits as "wages," not "compensation." *Id.* That distinction explains why the 1988 amendments did not include reemployment stipend benefits among the types of compensation in AS 23.30.105(a) that toll the limitations period. In 2000, the legislature both changed the nature of reemployment

(continued...)

legislature's intent was to clarify that voluntary payment of indemnity benefits (including impairment benefits) tolls the limitations statute. We have found no indication in the legislative history that the legislature intended to simultaneously exempt impairment benefits from the statute of limitations, and Murphy cites no express intent to do so.

A subsequent amendment and its legislative history plainly show that the legislature interpreted AS 23.30.105(a) to subject all kinds of compensation expressly mentioned to the limitations period.[62] In 2000 the legislature amended both AS 23.30.041 and AS 23.30.105(a) by designating subsection .041(k) stipend benefits "compensation" and by inserting AS 23.30.041 into the list of statutory sections in AS 23.30.105(a)'s tolling provision.[63] The amendment to AS 23.30.041(k) was meant "to change reemployment 'wages' into a form of 'compensation,' allowing certain offsets and reductions."[64] The Department of Labor and Workforce Development told the

---

[61]     (...continued)
stipend benefits from "wages" to "compensation" and added these benefits to the list of statutes in AS 23.30.105(a). Ch. 105, §§ 4, 10, SLA 2000. The reason for the 2000 amendments is explained more fully below.

[62]     We have noted that post-enactment legislative history is disfavored, because, according to the U.S. Supreme Court, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Girdwood Mining Co. v. Comsult LLC*, 329 P.3d 194, 199 n.21 (Alaska 2014) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)). But the intent of the 2000 legislature is instructive here because it merely inserted an additional type of benefit in the statutory framework the 1988 legislature created, so the latter legislature's understanding of how that framework operates confirms the earlier legislature's intent. *See id.* (observing that subsequent legislative history "can provide confirmation of past or current legislative preferences").

[63]     Ch. 105, §§ 4, 10, SLA 2000.

[64]     Dep't of Labor & Workforce Dev., Sectional Analysis of H.B. 419, 21st
(continued...)

legislature that adding AS 23.30.041 to the list in AS 23.30.105(a) would "place a two-year time limit on the employee's right to request reemployment benefits."[65]  The 2000 legislative history supports the Commission's interpretation of AS 23.30.105(a) because it shows that the 2000 legislature thought that inserting a statutory section into AS 23.30.105(a)'s tolling provision would make the corresponding compensation subject to the two-year limitations period.

### 3. Policy, practicality, and common sense weigh in favor of applying the same two-year limitations period to impairment claims that applies to other claims for indemnity benefits.

Policy considerations, practicality, and common sense support interpreting AS 23.30.105(a)'s limitation period to include claims for impairment benefits.  When asked at oral argument before us why the legislature would have exempted impairment benefits from a statute of limitations, Murphy postulated that impairment benefits are "easy to prove" and "can be proven from the written record," making it unlikely that a long-delayed impairment claim would prejudice an employer.  He also suggested that because a permanent impairment will last for the rest of the claimant's life, the legislature was not as concerned with a time limit on filing.  Neither of these suggestions is persuasive.

Although Murphy's own claim for additional compensation might be easy to prove from a written record, that is certainly not true of all impairment claims.  With

---

[64]  (...continued)
Leg., 2d Sess. (Mar. 7, 2000), in H. Labor & Commerce Comm. file on House Bill (H.B.) 419, 21st Leg., 2d Sess.

[65]  *Id.*; *see also* Dep't of Labor & Workforce Dev., Side-by-Side Analysis of H.B. 419, 21st Leg., 2d Sess. (Mar. 7, 2000) (indicating that proposed legislation "[p]laces a two-year time limit on the employee's right to request reeemployment benefits"), in H. Labor & Commerce Comm. file on H.B. 419, 21st Leg., 2d Sess.

no limitations period a claimant could wait for years before undergoing an impairment evaluation and filing a claim. The resulting delay in rating the impairment could create significant proof problems in determining causation for a specific degree of impairment or in apportioning responsibility if multiple factors contributed to the impairment. Even in Murphy's case, where two ratings were done in the course of a year, a factual issue about medical stability remained, with Murphy himself telling the Board that the crucial issue was the date of medical stability.

And although permanent impairment is, by definition, permanent, that does not mean it is immutable. The AMA Guides recognizes that a condition may deteriorate over time even after medical stability.[66] Subsequent events can also affect a permanent impairment,[67] again resulting in potentially difficult issues of causation or apportionment if the impairment need not be rated soon after medical stability. These are precisely the types of problem that a limitations period protects against by encouraging claimants to file promptly.

When considering the Act as a whole, which we must do when we interpret AS 23.30.105(a), we see no policy reason to treat impairment differently from any other indemnity benefit for purposes of the statute of limitations. Murphy's argument would exempt more than impairment from AS 23.30.105(a)'s limitations period. Reemployment benefits, including stipend benefits, are not clearly "compensation for disability," yet the 2000 legislative history clearly manifests an intent to impose a two-

---

[66]     AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 26 (6th ed. 2008) (stating that maximum medical improvement is "date from which further recovery or deterioration is not anticipated, although over time (beyond 12 months) there may be some expected changes").

[67]     *See, e.g.*, *Darrow v. Alaska Airlines, Inc.*, AWCAC Dec. No. 218 at 3 & n.9 (Oct. 13, 2015), https://labor.alaska.gov/WCcomm/memos-finals/D_218.pdf (setting out increased impairment benefits payments based on surgeries over course of claim).

year limitations period on them. Construing AS 23.30.105(a) as applying only to disability compensation or death benefits, with no limitations period on other non-medical benefits, would create difficulties for both the Board and employers. Litigation costs, which the legislature sought to diminish with the 1988 amendments to the Act,[68] would likely increase. These policy reasons support interpreting AS 23.30.105(a)'s two-year limitations period to apply to impairment (and reemployment benefit) claims.

Although we distinguished between "impairment" and "disability" for purposes of AS 23.30.180 in *Alaska Airlines, Inc. v. Darrow*, we did not conclude — nor are we required to — that the legislature intended these terms to be mutually exclusive throughout the Act. In fact we specifically contemplated in *Darrow* that the legislature might have used the terms interchangeably.[69] The question in *Darrow* was whether AS 23.30.180 permitted an employer to offset an award of permanent total disability benefits by the amount of permanent partial impairment benefits the employee previously received.[70] Although AS 23.30.180 permitted an offset of permanent partial disability benefits, this plain language, paired with the statute's effective date, " 'effectively applie[d] to no cases whatsoever' and raise[d] the possibility that a drafting error of some type was made."[71] But it was not clear what the error was.[72] The legislature may have actually intended to allow an offset of permanent partial impairment benefits and

---

[68] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1130 (Alaska 2017).

[69] *Cf. id.* at 1128.

[70] *Id.* at 1127-28.

[71] *Id.* at 1129 (quoting party's argument).

[72] *Id.* ("Two distinct drafting errors are possible.").

mistakenly used the term "disability" instead.[73]  Or the legislature may have intended to permit an offset of permanent partial disability awards made in the past but used an erroneous effective date for the amendment.[74]  The legislative history yielded "few clues as to the legislature's intent."[75]  And the policy implications supported either conclusion. On the one hand, impairment benefits compensate for a different loss than disability benefits, so it would have been reasonable not to offset previously paid impairment benefits from a later disability award.[76]  On the other hand, the legislature chose to award impairment benefits only to those employees who are not permanently disabled,[77] so it would also have been reasonable to permit an offset of impairment benefits if permanent total disability benefits were later awarded.  With no clear indication of legislative intent, we declined to correct the apparent error in AS 23.30.180 because "[t]he separation of powers doctrine 'prohibits this court from enacting legislation or redrafting defective statutes.' "[78]

But with AS 23.30.105(a), the legislature's intent is clear.  Notwithstanding the ambiguity in the statute's text, the legislative history and policy considerations point

---

[73]     *Id.*

[74]     *Id.*

[75]     *Id.*

[76]     *Id.* at 1130 ("The compensation for impairment is awarded independent of earning capacity and for a different type of loss than the later permanent disability compensation, which depends on a worker's inability to earn wages.").

[77]     *See* AS 23.30.190(a) (permitting award of impairment "[i]n case of impairment partial in character but permanent in quality, and not resulting in permanent total disability").

[78]     *Darrow*, 403 P.3d at 1131 (quoting *State v. Campbell*, 536 P.2d 105, 111 (Alaska 1975)).

in only one direction: The legislature intended impairment claims to be subject to the same two-year limitations period as all other claims for indemnity compensation.[79] Interpreting the statute to give effect to legislative intent is entirely consistent with — indeed required by — the separation of powers doctrine. We therefore hold that the Commission did not err in deciding that AS 23.30.105(a) applies to impairment claims.[80]

---

[79] As noted above, there is no persuasive explanation for why the legislature would have intended to exempt impairment claims from the limitations period that applies to all other claims for monetary compensation. The conceptual distinctions between impairment compensation and disability compensation are not relevant to the policies behind the limitations period.

[80] Separately but relatedly Murphy takes issue with the Commission's statement that AS 23.30.105(a)'s tolling provision "expressly limits" a claim for impairment benefits "to the necessity of being filed within two years of the last payment of [impairment] benefits." Murphy contends that because the statute provides that "a claim may be filed" within two years of the last voluntary payment, the statute is intended to *allow* but not *require* filing of a claim within two years of the last voluntary payment. This argument is based on the use of the word "may": He argues that "[t]he language does not prohibit other claims, because its language is permissive (as opposed to restrictive)." We reject this argument. "May" is generally permissive, *see Gerber v. Juneau Bartlett Mem'l Hosp.*, 2 P.3d 74, 76 (Alaska 2000) ("[T]he term 'may' generally denotes permissive or discretionary authority and not a mandatory duty."), but this confirms our analysis of the statute because "may" serves this exact function in AS 23.30.105(a). The penultimate sentence *permits* an employee whose limitations period has already expired to file a timely claim; an employee can choose not to file one. If "may" made the two-year limitation period optional, employers would be reluctant to voluntarily pay compensation because doing so would vitiate protection against long-stale claims. That construction is plainly contrary to the Act's purpose. *See* AS 23.30.001 (requiring that Act be construed "to ensure quick, efficient, fair, and predictable delivery" of compensation); *see also Harris v. M-K Rivers*, 325 P.3d 510, 518 (Alaska 2014) ("The Alaska Workers' Compensation Act sets up a system in which payments are made without need of Board intervention unless a dispute arises.").

**B.  The Commission Did Not Err By Deciding That The Statute Of Limitations Barred Murphy's 2017 Claim For Increased Impairment.**

The Commission decided that the limitations period for Murphy's claim for increased impairment expired in June 2003 because that was two years after the Borough's last voluntary payment of impairment benefits. We see no error in this ruling. The compensation report filed with the Board on June 11, 2001, although somewhat confusing,[81] suggests that Murphy received his final impairment payment in May 2001 because the report shows reemployment stipend payments beginning on May 22, 2001. Murphy had two years from that date to file a claim for increased impairment.

Murphy argues that the Borough's failure to controvert one of the ratings in 2001 deprived him of notice that would have permitted him to discover the discrepancy in payments and allowed him the "opportunity, at that time, to retain legal counsel." But when voluntary payment of compensation tolls the limitations period under AS 23.30.105(a), the two-year period begins to run from the "last payment of benefits." The statute does not require controversion to start the clock ticking. Nor does it contain a "discovery rule" for claims that have already been tolled by voluntary payment.[82]

---

[81]    The compensation report is confusing for a number of reasons. As we previously noted, the original June report left blank the information about the percentage of impairment and the method of payment. The corrected June 2001 report inserted the impairment percentage but still did not answer whether the impairment benefits had been paid in installments or as a lump sum, even though the form required that information. The impairment benefits amount was presented as a lump sum in both the June and December 2001 compensation reports, with no information about a weekly rate or the number of weeks and days the benefit was paid.

[82]    This is in contrast to the limitations period for claims generally, which begins when "the employee has knowledge of the nature of the employee's disability and its relation to the employment and after disablement." AS 23.30.105(a).

-27-                                                           7555

The compensation reports — incomplete as they were — should have prompted Murphy to inquire about his impairment payments. Both the December 2001 and the original June 2001 compensation forms showed that the Borough had paid $20,993.38 in impairment benefits. The forms also showed that an employee's impairment rating was at that time multiplied by $135,000 to calculate total impairment benefits. Murphy apparently believed that he had received a 30% impairment rating. But $20,993.38 is clearly less than either 30% or 20%[83] of $135,000. The compensation reports contained adequate information to put Murphy on notice of a claim for additional impairment benefits.

Because Murphy had two years from the date of the last impairment benefit payment in 2001 to file a claim for increased payment, his 2017 workers' compensation claim was untimely. The Commission correctly affirmed the Board's decision rejecting his 2017 claim for increased impairment.

## C. The Commission Did Not Err In Upholding The Board's Regulation About Paralegal Affidavits.

The Board denied Murphy's request for $993.75 in paralegal costs because he did not comply with a regulation establishing procedures for claiming these costs. This regulation, 8 AAC 45.180(f)(14), requires a paralegal to sign and file an affidavit listing the time spent on a claim and the task performed. Murphy argues the regulation is invalid because it is contrary to statutory authority and unconstitutional. We reject these arguments and uphold the Commission's decision affirming the Board's denial of costs.

---

[83] The rating percentage used to calculate his impairment benefit amount was reduced by 10% on account of his previous back injury, so a 30% overall impairment rating would have yielded a 20% multiplier for his impairment benefit. *See* AS 23.30.190(c).

An award of costs and fees in Board proceedings is governed by AS 23.30.145. When seeking fees and costs from the Board, Murphy did not specify whether he sought attorney's fees under AS 23.30.145(a) or (b), and the Board awarded fees under AS 23.30.145(b). This subsection permits the Board to award a successful claimant "costs in the proceedings, including reasonable attorney fees."

Relying on *Muller v. BP Exploration (Alaska), Inc.*, Murphy contends that the regulation is invalid because it "differs substantively from the clear language of the statute."[84] But there is no apparent contradiction because the statute does not mention paralegal services or how to recover this expense. The Act authorizes the Board to adopt procedural rules.[85] The Board's regulation about attorney's fees and costs is a procedural rule to implement AS 23.30.145 and treats paralegal work as a cost rather than as a component of attorney's fees.[86] Reimbursing an attorney for paralegal time as a cost is not inconsistent with the statute and in fact mirrors our practice at the time the Board's regulation was adopted.[87] There is nothing improper in interpreting "costs" in AS 23.30.145(b) to include paralegal services, nor is a requirement that a paralegal

---

[84]    923 P.2d 783, 792 n.9 (Alaska 1996).

[85]    AS 23.30.005(h).

[86]    In contrast, Alaska Civil Rule 82(b)(2) authorizes an award of attorney's fees for "legal work customarily performed by an attorney but which was delegated to and performed by a[] . . . paralegal."

[87]    The Board promulgated the provision allowing an award for paralegal work in 1990. Alaska Administrative Code, Register 113 (Mar. 16, 1990). In *Atlantic Richfield Co. v. State* we held that "paralegal expenses are correctly characterized as costs and, if recoverable, should be requested under [Alaska] Civil Rule 79(b)." 723 P.2d 1249, 1253 (Alaska 1986). We amended Civil Rules 79 and 82 in 1993, disallowing paralegal expenses as costs and bringing them within attorney's fees awards. Alaska Supreme Court Order No. 1118 (Jan. 7, 1993).

submit a separate affidavit inconsistent with AS 23.30.145's statutory language. We therefore reject Murphy's argument that the regulation is contrary to statute.

Murphy's constitutional argument is equally unavailing. He appears to argue that the regulation violates the constitutional right against self-incrimination because it requires a paralegal to attest to unauthorized practice of law, which is a crime.[88] Murphy does not say whether his constitutional challenge is facial or as-applied, but neither would have merit.[89] As the Borough correctly points out, engaging in the unauthorized practice of law entails "representing oneself by words or conduct to be an attorney."[90] The Board's costs regulation merely requires paralegals to file an affidavit itemizing the services they provided; it does not require them to say that they held themselves out as attorneys.[91] To the contrary: the regulation permits the award of paralegal costs only when the paralegal is employed by a licensed attorney and "performed the work under the supervision of a licensed attorney."[92] The regulation does not require paralegals to incriminate themselves in seeking recovery of paralegal costs, so we reject Murphy's constitutional challenge.

---

[88] *See* AS 08.08.230 (providing that person who is not licensed to practice law and engages in the practice of law as defined in the Alaska Bar Rules is guilty of class A misdemeanor). Alaska Bar Rule 63 defines the unauthorized practice of law for purposes of AS 08.08.230 as including "representing oneself by words or conduct to be an attorney" as well as providing certain law-related services.

[89] *See State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 372 (Alaska 2009) (distinguishing facial constitutional challenge from as-applied challenge).

[90] Alaska Bar R. 63 (defining "practice of law" for purposes of AS 08.08.230).

[91] 8 AAC 45.180(f)(14).

[92] 8 AAC 45.180(f)(14)(A)-(B).

## V.    CONCLUSION

We AFFIRM the Commission's decision.

**7555**