*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NATIVE VILLAGE OF SAINT MICHAEL, | ) ) ) | Supreme Court No. S-19301 |
| Appellant, | ) ) ) | Superior Court Nos. 2NO-19-00009/ 00010 CN (Consolidated) |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF FAMILY & COMMUNITY SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) ) ) ) ) | No. 7777 – July 25, 2025 |
| | ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Nome, Romano D. DiBenedetto, Judge.

Appearances: Maggie Massey, Kawerak, Inc., Anchorage, for Appellant. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

PATE, Justice.

# I.    INTRODUCTION

The Office of Children's Services (OCS) removed two Indian children from their home after police found their parents intoxicated and unable to provide necessary care.  After the superior court adjudicated the children to be in need of aid, the children's tribe intervened.

The children's father subsequently moved to another state.  After a prolonged failure to engage with OCS, he ultimately completed all of the case plan requirements set by the agency.  Given the father's significant positive behavioral changes, OCS made preparations to work with the other state to place the children with their father through the Interstate Compact for the Placement of Children (ICPC).

After an initial home study, authorities in the other state denied approval under the ICPC.  Despite the denial, OCS sought permission from the superior court to release custody to the father while he was temporarily present in Alaska pursuant to AS 47.14.100(p).  The Tribe opposed release of custody to the father, maintaining that OCS had not received the other state's approval, which was necessary for placement under the ICPC.  The court found that the ICPC was inapplicable to a release of custody to a parent under AS 47.14.100(p).  The court then granted OCS's request and dismissed the case.  And OCS released custody to the father before he departed Alaska.

We conclude that when OCS properly releases custody of a child to a parent pursuant to AS 47.14.100(p), the requirements of the ICPC have no application, even if that parent plans to subsequently transport the child to another state.  Accordingly, we uphold the superior court's decision that the ICPC was inapplicable under the circumstances and that the other state's approval was not required for placement with the father.  And we affirm the court's dismissal of the case.

## II. FACTS AND PROCEEDINGS

### A. Initial Removal Proceedings

In March 2019 the Nome Police Department responded to a report of a disturbance and found Caleb K. and Milo K., both minors, in the care of their parents, Zara F. and Brian K.[1]  Both parents were highly intoxicated.

OCS took emergency custody of Caleb and Milo and petitioned for temporary custody and adjudication of the children as being in need of aid.[2]  The superior court granted OCS temporary custody.[3]  Caleb and Milo are Indian children as defined by the Indian Child Welfare Act (ICWA).[4]  The Native Village of Saint Michael intervened as their tribe in June.[5]  The court adjudicated the children in need of aid in September.  And Caleb was placed with his maternal grandmother, while Milo was initially placed in a group home.[6]

The court held a disposition hearing in November.  OCS recommended that the children be committed to OCS custody for a period not to exceed two years.  OCS reported that Caleb had experienced "significant[] academic delays" due to "significant [school] attendance issues."  And Milo had "significant behavioral issues"

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    Specifically, OCS alleged that the parents were "unwilling or unable to provide care, supervision or support" for the children; there was "a substantial risk" the children would "suffer substantial physical harm," or they had suffered such harm, "as a result of conduct by or conditions created by" the parents; the parents had subjected the children to neglect; and the parents' ability to care for the children had "been substantially impaired by the addictive or habitual use of an intoxicant," thus putting the children at "substantial risk of harm."  *See* AS 47.10.011(3), (6), (9)-(10); CINA Rule 7.

[3]    The court also appointed a guardian ad litem (GAL) for Caleb and Milo.

[4]    25 U.S.C. § 1903(4).

[5]    *See* 25 U.S.C. § 1903(5); *see also* CINA Rule 2(h).

[6]    Initially only Caleb's placement complied with ICWA.  However, Milo was eventually placed in an ICWA-compliant foster home.

that interfered with his ability to enroll in Head Start. OCS noted that both parents had worked with OCS to create case plans, but neither parent had consistently engaged with the service providers to which OCS had referred them. Although Brian told OCS that he was maintaining intermittent periods of sobriety, OCS reported that Brian continued to drink and had missed a planned visit with the children.

At the conclusion of the November disposition hearing, the superior court granted OCS's request for custody, finding it was in the children's best interest. The court also ordered both parents to continue working on their case plans with OCS and to participate in any recommended family support services. Brian moved to another state in the months after the hearing.

In the two years following his move, Brian made no progress on his case plan. OCS reported that it was unable to reach Brian during 2021, although it did make contact with Brian's new domestic partner in May. OCS changed the children's permanency goal from reunification to adoption in April 2021. As of March 2022, OCS still had not been able to contact Brian despite repeated attempts.[7]

## B. Termination Petition And Brian's Subsequent Progress

Two pivotal events occurred in 2022. First, OCS filed a petition to terminate Brian's and Zara's parental rights in June. And second, following the assignment of a new caseworker, Brian began to make "significant change according to case plan recommendations." Brian's case plan recommended substance abuse and mental health assessments, parenting classes, and supervised visitations with his children. Brian began attending weekly outpatient treatment as required and "made significant progress with his counselor." Brian also completed parenting classes and attended weekly Alcoholics Anonymous meetings. According to OCS, Brian eventually completed everything he was asked to do on his case plan. The caseworker

---

[7] Zara had consented to Caleb and Milo's adoption by this point.

testified to observing "significant behavioral change in the family, the life, [and Brian's] dedication and willingness." Brian's counselor reported that Brian had "shown safe and sober behavior that would safely meet the needs of his children."[8] Based on Brian's progress, OCS successfully moved the court to vacate the termination trial that had been scheduled for September.

Despite Brian's compliance with his case plan, OCS reported in October 2022 that Brian had not yet made "substantial progress" toward remedying the problems that caused Caleb and Milo to become children in need of aid.[9] Still, OCS noted that Brian's progress qualified as a "compelling reason"[10] not to pursue a termination of parental rights. OCS represented that Brian "made a drastic positive change[] in efforts toward[] reunification but need[ed] to maintain communication with his children through [OCS]." OCS asked the superior court to extend its custody of the children for an additional year so that Brian could continue to advance toward possible reunification.

Over the next year, Brian made additional progress. In October 2023 OCS filed a permanency report that recommended changing the children's permanency goal from adoption to reunification with either parent. OCS reported that both parents had "made substantial progress in mitigating the safety threats that caused removal of their children from their care." Brian was also working full time, and OCS had "no . . . concerns regarding substance abuse or instability." OCS noted, however, that placement with Brian would require approval through the ICPC.[11] OCS explained that, to this end, it had assisted Brian with completing necessary paperwork, which was then

---

[8]    Caleb visited Brian in July, and Milo visited in December.

[9]    *See* AS 47.10.080(l)(4)(B) (requiring court to consider whether parent has made substantial progress when developing permanency plan for child in need of aid); CINA Rule 17.2(e)(1).

[10]    *See* AS 47.10.080(l)(2)(C) (permitting delay of termination of parental rights for compelling reasons); CINA Rule 17.2(e)(4).

[11]    AS 47.70.010-.080.

sent to Alaska's ICPC office for finalization and transmittal to the other state's authorities.

### C. ICPC Process

Alaska sent its ICPC request to the other state in February 2024, but the other state denied approval for placement of the children with Brian. The OCS caseworker stated in an affidavit that the approval for placement was denied "due to difficulties meeting and communicating with [Brian]." Because of those difficulties, the other state's authorities "expressed uncertainty of the parents' abilities [to] work cooperatively with [Milo's] service providers"; but they did not "document safety concerns or concerns regarding parenting issues." Further, OCS pointed out that the other state's investigation found that Brian had sufficient income and resources to care for the children, that Brian had learned about Milo's special needs, and that Brian and his partner were "committed to the permanency of [Milo] and [Caleb]."

In July 2024 OCS notified the parties that it planned to release custody of the children to Brian while he was temporarily in Alaska, with the release to occur after the September 30 status hearing. The caseworker explained that Brian had made significant efforts to become active in his children's lives; he was available for every telephonic visitation, actively engaged in teletherapy with Milo, and had been proactive in meeting with possible service providers for Milo. Further, both children had visited Brian in the other state, "and those visits went well." OCS reported that the other state had denied approval of placement with Brian "because the family was insistent that all contact be in writing . . . and they wanted [their attorney] to be with them for meetings." OCS then "weighed permanency options" and found that terminating Brian and Zara's parental rights "would not achieve permanency." And OCS believed that continuing to seek a placement through the ICPC "would delay permanency for another year or longer," which "would not be in the best interests of either child."

### D. Placement Hearing And Release Of Custody

The day after notifying the parties of its plans to release custody, OCS requested a status hearing. The superior court scheduled a status hearing for September 30. Four days before the status hearing, OCS filed a motion to release custody[12] and close the case. In an accompanying affidavit, OCS explained that despite the other state's refusal to approve placement under the ICPC, OCS had "no safety concerns" with returning the children to Brian and that further delaying the children's permanency would be "contrary to their wellbeing." The agency pointed to Brian's efforts to connect with the children and the progress he had made on his case plan.

The same day, St. Michael filed two motions. First, it opposed OCS's motion for release of custody, arguing that OCS did not have sufficient information to determine that releasing custody was in the children's best interest. The Tribe also maintained that OCS had not given the parties enough notice and that the agency was required to comply with ICPC requirements before releasing custody to Brian. Second, St. Michael filed a motion to appoint an attorney for Caleb, asserting that Caleb and his GAL were not aligned on whether OCS should release custody and that Caleb was concerned about going to live with Brian.[13] The superior court issued an order granting OCS's motion to release custody the next day. It did not immediately rule on the motion to appoint an attorney for Caleb.

Although OCS planned to release custody of the children to Brian after the status hearing, the superior court informed the parties at the beginning of the hearing that it had signed the release of custody order prematurely, thinking it was unopposed.

---

[12]    *See* AS 47.14.100(p).

[13]    *See* CINA Rule 12.1(b)(2) (providing court with discretion to appoint attorney if "[t]he child's and guardian ad litem's positions are not aligned on placement").

The court, rather than vacate the order altogether, scheduled a contested hearing on the motions for October 2.[14]

At the subsequent contested hearing, the superior court heard testimony from the children's GAL, St. Michael's family coordinator, Alaska's ICPC coordinator, and the caseworker. The GAL testified that she was concerned about Brian's failure to cooperate with the other state's child protective services agency. The GAL also noted that Caleb had expressed concern about returning to Brian's custody and that she felt it was in his best interest for the court to hear from him before custody was released. St. Michael's family coordinator also testified that the Tribe "would like for [Caleb's] voice to be heard." The ICPC coordinator testified that the ICPC applied "[a]nytime a child is going to be placed across state lines" and that when a proposed placement was with a parent who had previously lost custody of the child to OCS, the ICPC required a home study and approval of the receiving state for the placement. The OCS caseworker testified that Brian had "complete[d] his case plan" and "did everything the department asked." The caseworker also described Brian as "a voracious advocate for his children" and explained that permanency for the children was extremely important.

At the end of the hearing, the superior court made an oral ruling that it was in the children's best interest to release custody to Brian. The court pointed to testimony that OCS had no safety concerns about Brian, testimony which the court described as "uncontradicted." The court also questioned whether it had the authority to order OCS to retain custody of the children without any evidence to support removal findings.[15] Finally, the court concluded that the ICPC "on its face does not apply to a situation like this" because OCS was not transferring supervision of its child in need of aid (CINA)

---

[14]     St. Michael did not raise the issue of appointed counsel for Caleb at the status hearing.
[15]     *See* 25 U.S.C. § 1912(e).

case from Alaska to another state. Given its decision to release custody, the court declined to consider St. Michael's motion to appoint counsel for Caleb.

St. Michael sought reconsideration of the superior court's decisions. The Tribe argued that the court had erred by holding that the ICPC was inapplicable and that the court had failed to make the written best interest finding required under AS 47.14.100(p)(3). But in a subsequent written order, the court reaffirmed its conclusion that the ICPC was inapplicable. The court also affirmed its oral best interest finding, which it said was based on OCS's position that reunification was both safe and in the best interest of the children.

St. Michael appeals.

## III. STANDARD OF REVIEW

Mootness is "a matter of judicial policy" and is thus a question of law that we review using our independent judgment.[16] Statutory interpretation "is a question of law to which we apply our independent judgment, interpreting the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[17]

## IV. DISCUSSION

The ICPC, enacted in 1976,[18] aims to ensure the safety of children who are placed across state lines "in foster care or as a preliminary to a possible adoption" by requiring cooperation between the child protection agency in the "sending" state and the child protection agency in the "receiving" state.[19] Generally, any placement must comply with the child protection laws of the receiving state, and the receiving state may

---

[16] *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 993-94 (Alaska 2006).

[17] *Mun. of Anchorage v. Stenseth*, 361 P.3d 898, 904 (Alaska 2015).

[18] Ch. 216, § 1, SLA 1976.

[19] AS 47.70.010 (arts. I(a)-(b), III(a)-(b)).

deny a placement that appears "contrary to the interests of the child."[20] In return, the sending agency retains jurisdiction over the child to decide any matters related to "custody, supervision, care, treatment and disposition of the child."[21]

Alaska Statute 47.14.100(p) is a separate child protection law that allows OCS to release a child from state custody under certain conditions, which include filing a motion in superior court "that describes the reasons the release is in the best interest of the child" and obtaining a written finding from the court that release is in the child's best interest.[22]

St. Michael argues that the superior court (1) violated the ICPC by approving the children's release to their father without the other state's approval, (2) failed to make adequate best interest findings to support the release of custody under AS 47.14.100(p), (3) erred in concluding that release of custody was in the children's best interest under that statute, and (4) abused its discretion by denying appointed counsel for Caleb.

However, as both parties acknowledge, all these issues are moot. The superior court closed the case, which deprived OCS of " 'the power granted it by the adjudication order to interfere with [the] family' on the child protection matter."[23] Still, St. Michael asks us to review the ICPC's applicability under the public interest exception to mootness. OCS responds that the public interest exception is inapplicable.

---

[20]    *Id.* (art. III(a), (c)).

[21]    *Id.* (art. V(a)).

[22]    The statute contains additional requirements, such as notifying the GAL, that depend upon the age of the child being released. AS 47.14.100(p)(1).

[23]    *Reed S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 522 P.3d 182, 188 (Alaska 2022) (quoting *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 994 (Alaska 2006)); *see also* AS 47.10.010(a) (granting jurisdiction over children in need of aid who are "residing or found in" Alaska).

We agree with St. Michael that the ICPC's applicability to this case warrants review under the public interest exception to mootness. But the Tribe offers no argument why its other claims meet the public interest exception, so we do not consider them. We conclude that when OCS releases children in its custody to a parent under AS 47.14.100(p), the provisions of the ICPC are inapplicable even if that parent plans to subsequently depart Alaska with the children.

**A.    The Issue Of The ICPC's Applicability Warrants Review Under The Public Interest Exception To Mootness.**

We consider three factors in deciding whether to apply the public interest exception: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[24]

St. Michael asserts that the applicability of the ICPC to the circumstances of this case warrants review. First, the Tribe maintains that the issue of whether the ICPC should apply to a temporarily in-state parent is capable of repetition. The Tribe points out that the ICPC is regularly applied in Alaska; OCS has its own ICPC coordinator who applies the ICPC "daily." Second, St. Michael argues the issue is likely to evade review because, in cases like this, the release of custody and subsequent dismissal will moot any challenge to OCS's decision to avoid the ICPC. And third, St. Michael notes that resolving the interpretation of child placement laws is, as a general matter, in the public interest.[25]

---

[24]    *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1168 (Alaska 2002) (quoting *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1196 (Alaska 1996)) (internal quotation marks omitted).

[25]    *See Blythe P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 238, 244 (Alaska 2023) ("[C]larifying the standards governing child placement is important to the public interest.").

OCS responds that resolution of this case turns on the propriety of the superior court's best interest finding under AS 47.14.100(p), not on the application of the ICPC, and the best interest finding is a fact-intensive ruling that does not meet any of the factors of the public interest exception. "No other court will ever face" the "precise issue" of whether release of custody was in Caleb and Milo's best interest; accordingly, the issue is neither capable of repetition nor likely to evade review, OCS says. Further, OCS argues that using this case to refine the best interest standard under AS 47.14.100(p) is not in the public interest because of the lack of factual development before the superior court. The agency points out that " 'the only evidence' before the superior court was 'that the Department has no safety concerns.' " Because the superior court's decision was based on "an essentially uncontradicted record," OCS argues that this case is "a bad vehicle" for interpreting the requirements of AS 47.14.100(p). Finally, OCS asks us to "balance" the public's interest in the interpretation of AS 47.14.100(p) with the putative harm that the children would suffer if we were to rule in St. Michael's favor; an adverse ruling "could be weaponized against Brian by people who want to undermine his custodial rights," which could erode the children's view of their father.

We agree with OCS that the superior court's best interest finding underpinned its dismissal of the case and that St. Michael has not asked us to review the best interest finding under the public interest exception, but we conclude that St. Michael's claim regarding the ICPC warrants review. First, the ICPC is regularly applied in Alaska, and the lack of clarity surrounding the ICPC's applicability to a release of custody from OCS under circumstances similar to this case could arise again. Similar fact patterns have arisen in other states.[26] Second, the applicability of the ICPC

---

[26] *See, e.g.*, *In re R.S.*, 235 A.3d 914, 919-25 (Md. 2020) (appealing lower court's decision to close CINA case after finding ICPC inapplicable to placement with

-12-                                                                                              7777

to anticipated transfers of custody are likely to repeatedly evade review because the dismissal of the underlying CINA case and the child's relocation will inevitably moot any ICPC claim. And third, clarifying the ICPC's applicability is in the public interest because the ICPC is a "standard governing child placement," and clarifying such standards is in the public interest.[27]

Although OCS is correct that the superior court's best interest finding suffuses the ICPC issue, we disagree that we must address the former to resolve the latter. Rather, we think the question before us is better framed as addressing whether OCS is required to comply with the ICPC's interstate cooperation requirements if, under AS 47.14.100(p), the superior court finds that release to a parent is otherwise proper. In other words, assuming the validity of the court's best interest finding, we must resolve whether the court was nonetheless required to deny OCS's motion to release custody because the requirements of the ICPC had not been satisfied.

### B. When OCS Properly Releases A Child In Its Custody To A Parent Under AS 47.14.100(p), The Provisions Of The ICPC Are Inapplicable.

When a child is adjudicated as being in need of aid and placed in OCS's custody, the agency has the authority and duty find an appropriate placement for the child.[28] OCS may, if circumstances warrant, place the child with an adult family member or family friend,[29] a foster parent,[30] or in a suitable institution.[31] OCS may

---

out-of-state father); *IDHW v. Doe (2022-32)*, 525 P.3d 715, 717-18 (Idaho 2023) (involving applicability of ICPC to out-of-state father following denial of home study).

[27]  *See Blythe P.*, 524 P.3d at 244.

[28]  *See* AS 47.10.080(c)(1), .080(f); CINA Rule 10.1. ICWA imposes additional requirements for placements of Indian children. 25 U.S.C. § 1915(b).

[29]  AS 47.14.100(e)-(f).

[30]  AS 47.14.100(a).

[31]  *Id.*

also transfer a child from one placement setting to another.[32]  However, when OCS seeks to place a child outside Alaska, the ICPC is triggered.[33]

Substantively, the ICPC requires the agency[34] in a "sending" state to notify the "receiving" state of a potential placement, comply with the child placement laws of the receiving state, and obtain the receiving state's approval of the placement.[35] In return, the sending state retains jurisdiction over the child to the same extent "which it would have had if the child had remained in the sending agency's state."[36]  But the ICPC's application is limited.  For example, its requirements for cooperation and approval apply only to placements "in foster care or as a preliminary to a possible adoption."[37]

St. Michael argues that OCS was required to comply with the ICPC's approval requirement because it intended to transfer custody to a parent who lived out of state.  The ICPC applies "anytime a child is going to be placed across state lines," St. Michael says, which includes "reunification with a parent after relocation to another state."  Because OCS would have otherwise needed the other state's approval to transfer custody to Brian, St. Michael asserts that the agency could not sidestep that requirement by releasing the children to Brian while he was temporarily in Alaska.

OCS responds that the ICPC does not apply when parents with full parental rights move out of state with their children.  OCS points out that the ICPC's

---

[32]    AS 47.10.080(s).

[33]    AS 47.70.010 (art. III(a)).

[34]    The ICPC's expansive definition of "agency" includes "a person, corporation, association, . . . or other entity which sends" a child to another state. AS 47.70.010 (art. II(b)).

[35]    *Id.* (art. III).

[36]    *Id.* (art. V).

[37]    *Id.* (art. III(a)).

overarching mandate applies only to placements "in foster care or as a preliminary to a possible adoption."[38]  Similarly, the mandate applies to "sending agenc[ies]," which OCS asserts does not include parents.[39]  And OCS notes that the ICPC "does not apply to . . . [t]he sending or bringing of a child into a receiving state by the child's parent . . . and leaving the child with any such relative or non-agency guardian."[40]  Because the superior court dismissed the CINA case based on a valid best interest finding,[41] OCS argues that the ICPC does not come into play because the children are no longer in the custody of the agency.

"We construe statutes according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[42]  Our goal is "to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[43]  Accordingly, "[w]e give

---

[38]      No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

*Id.*

[39]      *Id.*

[40]      *Id.* (art. VIII(a)).

[41]      *See* AS 47.14.100(p).

[42]      *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017).

[43]      *Murphy v. Fairbanks N. Star Borough*, 494 P.3d 556, 563 (Alaska 2021) (quoting *City of Valdez v. State*, 372 P.3d 240, 254 (Alaska 2016)) (internal quotation marks omitted).

unambiguous statutory language its ordinary and common meaning," though we may also look to legislative history as an interpretive guide.[44]

The ICPC's language unambiguously precludes applying it to the circumstances of this case.[45] The ICPC's requirement that a receiving state approve a placement only applies to "placement[s] in foster care or as a preliminary to a possible adoption."[46] And the release of custody to a parent with full parental rights is neither foster care nor a preliminary to adoption. The ICPC further defines "placement" as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution."[47] The ICPC does not define "family free," but a natural reading of "placement" in the context of child protection law implies some degree of continuing oversight by OCS. As we have noted, "In the CINA rules, relevant statutes, and OCS regulations, 'placing' a child is distinguished from releasing a child from OCS custody."[48]

Reading "placement" as encompassing living arrangements over which OCS maintains some level of supervisory authority aligns with the other enumerated arrangements — boarding homes and child-caring agencies and institutions — and with the rest of the ICPC. For example, the ICPC provides that the sending agency "shall retain jurisdiction over the child sufficient to determine all matters in relation to the

---

[44] *Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1277 (Alaska 2020) (quoting *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 74 (Alaska 2013)) (internal quotation marks omitted).

[45] *See Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012) ("Statutory interpretation in Alaska begins with the plain meaning of the statute's text.").

[46] AS 47.70.010 (arts. III(a)-(b)).

[47] *Id.* (art. II(d)).

[48] *Clementine F. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 375 P.3d 39, 45 (Alaska 2016).

custody, supervision, care, treatment and disposition of the child."[49]  This provision makes little sense when that same agency has, with a court's approval, relinquished its jurisdiction by releasing custody to a parent.[50]  Likewise, the ICPC provides that the sending agency's jurisdiction over the child "shall continue . . . during the period of the placement."[51]  This language implies that placements are ongoing arrangements, whereas a release of custody marks the end of OCS's involvement.

Our interpretation is buttressed by decisions from other state courts that have considered the ICPC's definition of "placement."  Several jurisdictions have recognized "family free" to mean "nonparental residential arrangements."[52]  And courts that have read "family free" more expansively have generally limited the ICPC's applicability to placements with parents whose parental rights are legally "diminished or severed."[53]  Though we need not decide here whether the term "placement" can include a living arrangement with a parent whose parental rights are legally diminished, it is clear that a release of custody to a parent with intact parental rights does not fit into any such definition.  The ICPC "creates no requirement" that another state must "add

---

[49]     AS 47.70.010 (art. V(a)).

[50]     *See* AS 47.14.100(p).

[51]     AS 47.70.010 (art. V(a)).

[52]     *E.g.*, *In re R.S.*, 235 A.3d 914, 928 (Md. 2020) (quoting *In re Dependency of D.F.-M.*, 236 P.3d 961, 965 (Wash. App. 2010)); *cf. IDHW v. Doe (2022-32)*, 525 P.3d 715, 721-22 (Idaho 2022); *In re Alexis O.*, 959 A.2d 176, 182 (N.H. 2008).

[53]     *Ariz. Dep't of Econ. Sec. v. Leonardo*, 22 P.3d 513, 519 (Ariz. App. 2001) (holding that "family free" placement could include parent "whose rights have been 'diminished or severed by the action or order of any Court' "); *cf. H.P. v. Dep't of Child. & Fams.*, 838 So. 2d 583, 586 (Fla. App. 2003) (distinguishing between normal parental custody and "placement" with parent when court retains jurisdiction over child); *Green v. Div. of Fam. Servs.*, 864 A.2d 921, 927-28 (Del. 2004) (holding ICPC applicable to "non-custodial" parents).

its retrospective approval" to Alaska's otherwise lawful decision to release a child to their parent's custody.[54]

St. Michael argues that under the ICPC, OCS would have needed the other state's approval if the agency itself sent the children to live with Brian. Because the other state denied approval, the Tribe contends that OCS cannot now sidestep that requirement by releasing custody to Brian while he is in Alaska. But the Tribe's reading fails to recognize that OCS's jurisdiction over a child is not interminable. Alaska's child protection statutes provide mechanisms for OCS to take custody of a child if circumstances warrant,[55] and OCS can maintain custody if it demonstrates to the satisfaction of a court that continued custody is necessary.[56] The ICPC simply provides an additional avenue for OCS to maintain such legal custody when it places a child across state lines.[57] But the child protection statutes also allow, and at times require, OCS to release custody of a child to the child's parent when appropriate.[58] To the point, one of the purposes of the CINA statutes is to "promote . . . the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests."[59]

One statutory mechanism for returning custody of a child to a parent is AS 47.14.100(p), which provides that OCS may release a child under the age of 16 from state custody if it files a motion in the superior court explaining why releasing custody

---

[54]    *State, Dep't of Child. & Fam. Servs. v. L.G.*, 801 So. 2d 1047, 1050-53 (Fla. App. 2001).

[55]    *See* AS 47.10.142; CINA Rule 6.

[56]    *See* AS 47.10.086; CINA Rule 19.2(b).

[57]    *See* AS 47.70.010 (art. V(a)).

[58]    *See* AS 47.10.080(c)(2), .083, .100(b); AS 47.14.100(p); CINA Rule 17(f), 19, 19.2.

[59]    AS 47.10.005(1).

is in the child's best interest, and the superior court "makes a written finding that release from state custody is in the best interest of the child." The Tribe's argument boils down to a claim that a release of custody could not be in Caleb and Milo's best interest because the other state denied the placement. But nothing in the ICPC or Alaska's child protection statutes indicates that the legislature intended to give child protection agencies from other states veto authority over the in-state disposition of child custody matters.[60]

In sum, we conclude that when OCS properly releases custody of a child to a parent pursuant to AS 47.14.100(p), the requirements of the ICPC do not apply even if the parent plans to subsequently depart Alaska with the child. Holding otherwise would create requirements for a release of custody under AS 47.14.100(p) that go beyond those prescribed by the legislature.[61]

## V. CONCLUSION

The order of the superior court is AFFIRMED.

---

[60] St. Michael also argues that the ICPC regulations, which have not been enacted in Alaska, support its interpretation of the ICPC. However, we decline to reach these arguments. Even if we were to consider the language of the regulatory provisions, none of them support applying the ICPC to a release of custody.

[61] *See Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173, 1178 (Alaska 1985) ("[T]his court's role is not to amend . . . the statute but rather to interpret [it] . . . .").