*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MUNICIPALITY OF ANCHORAGE, formerly d/b/a Municipal Light & Power Department, <br><br> Appellant, <br><br> v. <br><br> STATE OF ALASKA, DEPARTMENT OF REVENUE, <br><br> Appellee. | Supreme Court No. S-18923 <br><br> Superior Court No. 3AN-21-07457 CI <br><br> O P I N I O N <br><br> No. 7807 – April 17, 2026 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances: Dean D. Thompson and Paul J. Jones, Kemppel, Huffman and Ellis, P.C., Anchorage, for Appellant. Mary Hunter Gramling, Chief Assistant Attorney General, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Oravec, Justice, not participating]

BORGHESAN, Justice.

## I. INTRODUCTION

This appeal involves a dispute over how to calculate tax credits for the Municipality of Anchorage's production of natural gas. Alaska law taxes the

production of natural gas, while also allowing gas producers to claim tax credits based on the costs of producing that gas. The law's formula for calculating tax credits entails subtracting certain production costs from the amount of taxable gas produced. The law defines what gas is taxable for purposes of this scheme. The tax credits are intended to create incentives for gas producers to invest in producing more gas.

When the dispute began, the Municipality owned one-third of a natural gas field in Cook Inlet. It used most of that gas to make electricity for its residents, selling only small amounts to third parties. A law specific to municipal governments provided that the Municipality had to pay production taxes on only the amount of gas it sold to others yet was eligible for tax credits "to the same extent as any other producer."

When the Municipality applied for tax credits, it calculated them based on costs for producing all of its gas against the very small amount of gas it actually paid taxes on. This calculation yielded sizeable tax credits. The Department of Revenue rejected this calculation. It took the position that the tax credit calculation should be based on the value of all the gas it produced, which met the statutory definition of taxable, even though most of this gas was not actually taxed under the special rule for municipalities. Therefore, it awarded the Municipality tax credits in far smaller amounts than the Municipality had claimed. The superior court affirmed the Department's decision. The Municipality appealed to us.

The dispute boils down to what the legislature meant when providing that municipal gas producers are eligible for tax credits "to the same extent as any other producer." We conclude that the legislature meant for a municipal gas producer's tax credits to be calculated according to the value of gas that the tax credit statutes define as taxable, rather than according to the value of gas that is actually taxed under the special rule that applies only to municipal producers. Although the statutory text is ambiguous, the legislative history supports this interpretation, and it is more consistent with the overall purpose of the tax credit statutes.

We also hold that the Department of Revenue could apply this interpretation of the relevant statutes to the Municipality's tax credit application without first having to adopt a regulation through the rulemaking process. Because the Department's interpretation was foreseeable, did not add any substantive requirements, and did not represent a change in policy, the Department was not required to undertake formal rulemaking.

## II. FACTS AND PROCEEDINGS

### A. Statutory Framework

In 2006 the legislature enacted a net-value tax on the production of oil and gas, which permitted producers to deduct and take credit for certain expenses against the value of the oil and gas produced.[1] This system remains in place today, but it has been amended in key respects since the events at issue in this case. Because this case concerns tax credits sought for the 2014 and 2015 tax years, we refer to the versions of the statutes in effect during those years unless otherwise indicated.

Three of these tax credits are at issue in this case: (1) the qualified capital expenditure credit;[2] (2) the well lease expenditure credit;[3] and (3) the carried forward annual loss credit.[4] Each credit is calculated by reference to either the producer's "production tax value of taxable . . . oil and gas" or "total taxable production" of oil and

---

[1]     The net-value framework replaced a gross-value production tax regime. *See* former AS 43.55.016 (2005) (requiring gas producers to calculate tax based on percentage-of-value or cents-per-Mcf, whichever was greater); ch. 2, TSSLA 2006 (adding tax credits for certain losses and expenditures, amending AS 43.55.011 to levy tax on both oil and gas producers and to reference AS 43.55.160 for tax calculation, and adding AS 43.55.160, which determines "production tax value" based on producer's lease expenditures).

[2]     Former AS 43.55.023(a)(1) (2014).

[3]     Former AS 43.55.023(*l*)(1) (2014).

[4]     Former AS 43.55.023(b) (2014).

gas for the year.[5]  All three credits are transferable.[6]  The credits appear to incentivize exploration for new gas:  entities incurring qualifying exploration expenses, but not yet producing gas and paying taxes, could help finance exploration by selling the credits to entities that do produce gas and pay taxes.[7]

### 1.    Oil and gas production taxes

Alaska's tax on the production of oil and gas is calculated by multiplying "the annual production tax value of the taxable oil and gas" by a set percentage.[8]  Production tax value is calculated by deducting "the producer's [adjusted] lease expenditures" for the year from the producer's gross value at the point of production (GVPP) "of that oil, gas, or oil and gas taxable under AS 43.55.011(e)."[9]  According to AS 43.55.011(e), the tax applies to "all oil and gas produced each calendar year from each lease or property in the state, less any oil and gas the ownership or right to which

---

**5**      Former AS 43.55.160(a)(1) (2014) (providing method to calculate "annual production tax value of taxable . . . oil and gas"); AS 43.55.165(e)(18) (2014) (providing that lease expenditures do not include portion of expenditures that are less than $0.30 multiplied by "total taxable production" from a lease property); *see* AS 43.55.023(b) (2014) (providing credit for carried forward annual loss by reference to portion of production tax values not deductible under AS 43.55.160 (2014)); AS 43.55.023(a)(1) (2014) (providing tax credit for certain qualified capital expenditures); AS 43.55.023(*l*)(1) (2014) (providing tax credit for certain well lease expenditures).

**6**      Former AS 43.55.023(d) (2014).

**7**      *See* 2006 H. Journal 4220-22 (Governor's Jul. 12, 2006 transmittal letter) (explaining that "approach taken by [H.B. 3001] would provide the state with a fairer share of the value of oil and gas production while encouraging vital investment in future production"); Hearing on House Bill (H.B.) 3001 Before the S. Special Comm. on Nat. Gas Dev., 24th Leg., 3d Special Sess., 3:47-3:49 p.m. (Aug. 9, 2006) (statements of Dr. Pedro Van Meurs, Consultant to the Governor) (describing how new tax framework would benefit new explorers by allowing them to recover losses incurred investing in exploration and explaining intent to "put an explorer with a first well in Alaska on exactly the same footing as a large well company").

**8**      Former AS 43.55.011(e)(1)(A) (2014).

**9**      Former AS 43.55.160(a)(1) (2014).

is exempt from taxation or constitutes a landowner's royalty interest."[10] The phrase "ownership or right to which is exempt from taxation" is further defined as "any ownership interest of the federal government or the state."[11] By its own terms, AS 43.055.011(e) exempts only royalty gas, state-owned gas, or federally-owned gas from production taxes.

To summarize, the statute levies a tax on the net value (gross value minus deductible expenses) of gas that is not royalty gas or gas owned by the State or federal government.

### 2. The capital expenditure credit and the well lease expenditure credit

Under this tax regime, producers may claim tax credits that can be transferred to other producers.[12] Producers may claim tax credits for certain types of lease expenditures, including qualified capital expenditures and well lease expenditures.[13] Lease expenditures generally include a producer's costs "to explore for, develop, or produce oil and gas" property beyond a certain threshold amount.[14] Qualified capital expenditures are, broadly and with some exceptions, costs "incurred for geological or geophysical exploration" or costs treated as capitalized expenditures under the Internal Revenue Code.[15] Well lease expenditures are either certain "expense[s] for seismic work" within a production unit or, with some limitations,

---

[10] Former AS 43.55.011(e) (2014). The Department of Revenue regulation 15 AAC 55.900(b)(22) (2014) further provided that taxable, "when used in reference to oil or gas or both, means produced from a lease or property in the state but excluding any oil and gas the ownership or right to which is exempt from taxation."

[11] Former AS 43.55.900(19) (2014).

[12] Former AS 43.55.023(d) (2014).

[13] Former AS 43.55.023(a), (*l*), (o) (2014).

[14] Former AS 43.55.165(a) (2014); AS 43.55.165(e)(18) (2014).

[15] Former AS 43.55.023(o) (2014).

qualified capital expenditures that meet further requirements under the Internal Revenue Code and are directly related to specified types of wells.[16]

But producers may not claim the full amount of these expenditures when seeking credits. The statute sets a threshold value for expenditures that count towards credits through a calculation the parties refer to as the "haircut."[17] The haircut is calculated by multiplying the producer's "total taxable production" by $0.30.[18] If a producer's total taxable production is larger, the haircut for its expenditures will be larger too, reducing the value of tax credits it can claim because only expenditures exceeding the haircut threshold qualify as "lease expenditures" under AS 43.55.165(e)(18).[19] Legislative history suggests that the haircut was enacted to approximate the replacement cost of aging facilities so that tax credits are awarded in amounts that correspond to investments in new production.[20]

### 3. The carried forward annual loss credit

The statutory scheme also allows producers in Cook Inlet to claim a credit for 25% of a "carried forward annual loss."[21] "[A] carried-forward annual loss is the amount of a producer's or explorer's adjusted lease expenditures under AS 43.55.165 and 43.55.170 for a previous calendar year that was not deductible in calculating production tax values for that calendar year under AS 43.55.160."[22] By statute,

---

[16]    Former AS 43.55.023(n) (2014).

[17]    Former AS 43.55.165(e)(18) (2014).

[18]    *Id.*

[19]    *Id.*

[20]    *See* Hearing on H.B. 3001, S. Special Comm. on Nat. Gas Dev., 24th Leg., 3d Special Sess., 11:45-11:55 (Aug. 9, 2006) (statements of Dr. Pedro Van Meurs, Consultant to the Governor).

[21]    Former AS 43.55.023(b) (2014).

[22]    *Id.*

production tax value cannot be less than zero.[23] So if a producer's lease expenditures[24] exceed its GVPP in a given year, the excess expenditures cannot be deducted from its tax obligation in that year. But those excess expenditures can be claimed for the carried forward annual loss credit in the following year. Thus, if a producer has low taxable production but high lease expenditures in a given year, it can claim a sizable carried forward annual loss tax credit in the next tax year.

### 4. Municipalities' special tax status

Municipal entities that produce oil and gas have a special status under the law. By statute, "[a] state law or regulation may not assess or tax, or be construed to assess or tax, a municipality unless the law or regulation expressly provides that the municipality is to be assessed or taxed by the particular law or regulation."[25] In light of this statute, we held in *Department of Revenue v. Municipality of Anchorage* (*DOR v. MOA*) that because the oil and gas production tax statutes in effect at the time did not expressly mention municipal gas producers, production taxes could not be assessed on gas produced by the Municipality.[26]

A few years after this decision, the legislature enacted AS 43.55.895, which addressed application of the oil and gas production statutes to municipal entities.[27] The first subsection of the statute provided that "a producer that is a municipal entity is subject to taxation and payment of surcharges under this chapter for oil and gas that it sells to another party."[28] Given the "express statement" requirement

---

[23]    Former AS 43.55.160(b) (2014).

[24]    Lease expenditures more generally include a producer's costs "to explore for, develop, or produce oil and gas" property after a certain threshold amount. Former AS 43.55.165(a) (2014); AS 43.55.165(e)(l8) (2014).

[25]    AS 29.71.030.

[26]    104 P.3d 120, 123-24 (Alaska 2004).

[27]    Ch. 1, § 64, SSSLA 2007, codified at AS 43.55.895.

[28]    Former AS 43.55.895(a) (2014).

noted above, and the holding of *DOR v. MOA*, the implication of this subsection was that a municipality's own-use gas was not subject to production taxes. The second subsection of AS 43.55.895 provided that "[a] municipal entity subject to taxation because of this section is eligible for all tax credits under this chapter to the same extent as any other producer."[29]

### B. Facts

In 2014 and 2015 the Municipality of Anchorage produced natural gas through its ownership interest in the Beluga River Unit in Cook Inlet. The Municipality received 33% of the Unit's natural gas production and was allocated 33% of the Unit's yearly lease expenditures. During these years, the Municipality used almost all of the gas it received through its ownership interest to produce electricity for local use. The Municipality sold $96,040 worth of gas in 2014 and $255,675 worth of gas in 2015. Each of these sales amounted to less than one percent of the Municipality's non-royalty gas production for each year, which the Department calculated to be over $36 million in both 2014 and 2015.

### C. Proceedings

In January 2016 the Municipality applied for a transferable tax credit certificate in the amount of $7,776,277 for the tax year ending on December 31, 2014. In March 2016 the Municipality applied for a tax credit certificate totaling $2,473,790 for the tax year ending on December 31, 2015. Each application sought credits for carried forward annual loss, capital expenditures, and well lease expenditures.[30]

---

[29] Former AS 43.55.895(b) (2014). The statute's third and final subsection defines "municipal entity" to include a municipally owned utility. Former AS 43.55.895(c) (2014).

[30] For 2014 the Municipality sought $278,990 in capital expenditure credit, $4,301,253 in carried forward annual loss credit, and $3,196,034 in well lease expenditure credit. For 2015 the Municipality sought $138,666 in capital expenditure credit, $2,277,739 in carried forward annual loss credit, and $57,385 in well lease expenditure credit.

After the Municipality applied for the 2014 credits but before the Municipality applied for the 2015 tax credits, the State introduced legislation that proposed to amend AS 43.55.895's provision on tax credits for municipal producers.[31] The Director of the Department's Tax Division, Ken Alper, testified in support of this bill before the legislature. Over the course of several hearings, Director Alper told the legislature that a "literal interpretation" of existing statutes allowed municipal producers to do what the Municipality of Anchorage had done — claim large tax credits by selling a small amount of gas and then offsetting all lease expenditures. The Department also provided a written presentation to the legislature to the same effect, stating that "[c]urrent law allows" that approach. This legislation ultimately passed, amending AS 43.55.895(b) to make a municipal gas producer eligible for tax credits "proportionate to its production taxable under AS 43.55.011(e)."[32]

In May 2016 the State denied the Municipality's request for a carried forward annual loss credit for each year, and partially denied the Municipality's requests for the other two credits.[33] The Municipality objected and timely requested an informal conference with an appeals officer. The Municipality argued that only the gas it sold should be considered taxable production for the credit calculations.

In March 2017 the State issued an informal conference decision that upheld its initial decision. The State determined that municipal own-use gas, although not taxed, should be counted as taxable production when calculating tax credits. It reached this conclusion in part because the credit formula was based on gas "taxable

---

[31]    H.B. 247, § 37, 29th Leg., 4th Special Sess. (Jan. 19, 2016).

[32]    Ch. 4, § 30, 4SSLA 2016.

[33]    For 2014 the State partially approved the Municipality's capital expenditure and well lease expenditure credits after adjusting them down to $9,431 and $108,030 respectively. For 2015 the State partially approved the Municipality's capital expenditure and well lease expenditure credits after adjusting them down to $49,078 and $20,138 respectively.

under AS 43.55.011(e)," and AS 43.55.900(19) defines gas "exempt from taxation" as "any ownership interest of the federal government or the state."[34]   Because AS 43.55.011(e) did not list municipal own-use gas as exempt from taxation, the State reasoned that this gas counted as taxable production when calculating tax credits.  The State relied on AS 43.55.895(b)'s proviso that a municipal producer is "eligible for all tax credits under AS 43.55 *to the same extent as any other producer*."  It reasoned that treating municipal own-use gas as taxable when calculating tax credits resulted in similar treatment of municipal and non-municipal producers.

The State also determined that even if the Municipality's reading of the statute were correct, its deductible lease expenditures would have to be prorated to the total taxable production to avoid an "absurd" result in which the Municipality received "special treatment" through the receipt of "millions of dollars of transferable tax credits compared to the small amount of taxes levied."  Noting that "tax credits are narrowly construed against the taxpayer," the State affirmed its initial decision disallowing the Municipality's requested tax credits.

The Municipality appealed the informal conference decision to the Office of Administrative Hearings (OAH).  The Municipality reprised its statutory interpretation argument.  In addition, the Municipality argued that the State's interpretation of the tax credit statutes in the informal conference decision was a novel interpretation of the statute that was invalid under the Administrative Procedures Act (APA) because it was not adopted through rulemaking.  This argument relied in part on Director Alper's testimony before the legislature.  The Municipality argued that the Director's testimony articulated the State's previous interpretation of the credit statutes, under which the Municipality was entitled to the claimed credits.  Therefore, the

---

[34]     *See* former AS 43.55.011(e) (2014); AS 43.55.900(19) (2014) (defining "ownership or right to which is exempt from taxation" as "any ownership interest of the federal government or the state").

Municipality asserted, the State's different interpretation of the statute when denying its tax credits represented an official change that required rulemaking.

The OAH's administrative law judge (ALJ) granted summary adjudication in favor of the State. The ALJ first decided that the Municipality's own-use gas must be deemed taxable production when calculating tax credits. It reasoned that " '[t]axable' oil or gas in this context is . . . not a question of whether the production is taxed, but whether the value of that production is considered when calculating tax — and in turn tax credits."

Examining the statutory text, the ALJ observed that the tax credit statutes were calculated by reference to oil and gas "taxable under AS 43.55.011(e)," which excludes only ownership interests of the federal or state government and landowner royalty interests.[35] Citing AS 43.55.895(b), the ALJ concluded that treating the Municipality as eligible for tax credits "to the same extent" as other producers required using the same definition of "taxable under AS 43.55.011(e)" that applied to other producers. Whether the Municipality was eligible for tax credits "to the same extent" as other producers depended, according to the ALJ, on the degree of eligibility for the tax credits rather than the particular method used to calculate the tax credits. The ALJ noted that other producers were eligible for carry forward annual loss credits only when their expenditures exceeded the value of their production. Similarly, capital and well credits were available to producers only when their qualified capital and well lease expenditures exceeded the haircut threshold intended to serve as a proxy for replacement costs. The ALJ noted that the Municipality's lease expenditures had not exceeded its production value, so calculating its credits based only on the amount of

---

[35]    *See* former AS 43.55.011(e) (2014) (levying tax on all oil and gas produced "less any oil and gas the ownership or right to which is exempt from taxation or constitutes a landowner's royalty interest"); AS 43.55.900(19) (defining "ownership or right to which is exempt from taxation" as "any ownership interest of the federal government or the state").

gas it paid taxes on, rather than the value of the gas it produced, would make it eligible for credits "to a far greater extent than other producers."

The ALJ also ruled that the State's interpretation of these statutes did not amount to a regulation that had to be adopted through formal rulemaking under the APA. The ALJ pointed out that Director Alper's legislative testimony was not an official decision of the agency. But even if it were, the ALJ reasoned, the Department "was within its authority to change that position and to do so without adopting a regulation." The ALJ described the Department's interpretation as "the type of commonsense interpretation that does not require regulation."

The Municipality timely appealed to the superior court. The court affirmed the ALJ decision. It framed the dispute as turning on whether the Municipality's own-use gas was "taxable" for the purpose of tax credit applications despite being exempt from production taxes. Applying the deferential reasonable basis standard to review the Department's interpretation of the tax statutes, the court ruled that the Department's interpretation was reasonable because AS 43.55.895 applied different rules to taxes and to credits for municipalities.

The superior court also rejected the Municipality's APA argument. The court was "not convinced" that Director Alper's testimony constituted the agency's "previous interpretation[]" of the statute. The court reasoned that the Department's interpretation was foreseeable considering the "somewhat unreasonable and unintended consequence of a literal interpretation of the statute." The superior court therefore affirmed the OAH decision.

The Municipality appeals.

## III. DISCUSSION

### A. The Municipality's Own-Use Gas Was Taxable Production For Purposes Of Calculating Its Tax Credits.

Whether the State erred in denying the Municipality's tax credit claims turns on whether the Municipality's own-use gas, which is not treated as "taxable" when

calculating production taxes, should nevertheless be treated as "taxable" when calculating tax credits.

Before we plumb the meaning of the statutes applied by the agency, we must first decide a threshold question: how much deference to give to the agency's own interpretation of the statutes. We then consider the statutory text, legislative history, and statutory purpose and apply canons of construction.

### 1. We give no deference to the agency's statutory interpretation.

There are two standards of review that can be applied to an agency's interpretation of a statute.[36] When "the knowledge and experience of the agency is of little guidance to the court or where the case concerns 'statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience,' " we apply the "substitution of judgment" standard.[37] Under the substitution of judgement standard, we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy" while "giv[ing] due deliberative weight 'to what the agency has done, especially where the agency interpretation is longstanding.' "[38]

"[W]hen a case requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision," we defer to an agency's interpretation of a statute if it has a "reasonable basis" in the law.[39] "[S]uch deference should be granted because the

---

[36] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) ("We use one of two standards to review agency interpretations of statutes.").

[37] *Earth Res. Co. of Alaska v. State, Dep't of Revenue*, 665 P.2d 960, 965 (Alaska 1983) (citing *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971)).

[38] *City of Valdez v. State*, 372 P.3d 240, 246 (Alaska 2016) (quoting *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 73 (Alaska 2013)).

[39] *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987) (quoting *Earth Res. Co. of Alaska*, 665 P.2d at 964).

agency, having specialized knowledge in a field, is in a better position than a court to make such determinations."[40] For example, we applied reasonable basis review in *Weaver Bros., Inc. v. Alaska Transportation Commission*.[41] There, a company challenged the Alaska Transportation Commission's approval of a motor carrier's permit transfer.[42] By statute, the permit could be transferred only if the carrier had been shown to be "regular and active" in using its rights to transport goods.[43] We held that the agency was in a better position to determine how to measure "active and regular use" given its expertise on transportation activity.[44]

We also apply reasonable basis review to administrative action taken pursuant to a legislative delegation of fundamental policy-making authority.[45] We did so in *Mobil Oil Corp. v. Local Boundary Commission*.[46] In that case the Local Boundary Commission had accepted a petition for incorporation of a borough pursuant to statutory guidance describing the general standards for incorporation.[47] We concluded that the "special function of the Commission" was to "undertake a broad inquiry into the desirability of creating a political subdivision of the state."[48] We

---

[40] *Weaver Bros., Inc. v. Alaska Transp. Comm'n,* 588 P.2d 819, 821 (Alaska 1978) (citing *Alaska Pub. Util. Comm'n v. Chugach Elec. Ass'n*, 580 P.2d 687, 694 (Alaska 1978); *Kelly*, 486 P.2d at 916-17).

[41] *See id.*

[42] *Id.* at 820.

[43] *Id.*

[44] *Id.* at 821.

[45] *Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 98-99 (Alaska 1974).

[46] *See id.*

[47] *Id.* at 95-96; AS 07.10.030 (1974). This statutory provision still exists but now can be found at AS 29.05.031.

[48] *Mobil Oil Corp.*, 518 P.2d at 97.

reasoned that the statute's use of terms like " 'large enough,' 'stable enough,' 'conform generally,' 'all areas necessary and proper,' 'necessary or desirable,' [and] 'adequate level' "[49] indicated the Commission's authority to make "broad judgments of political and social policy" about "whether an area is cohesive and prosperous enough for local self-government."[50] So the Commission's interpretation of the statutory terms when applying them to specific geographic areas was necessarily "an exercise of delegated legislative authority to reach basic policy decisions."[51] Deference to its interpretation was therefore justified.

The State argues that we should use the reasonable basis standard to review its interpretation of the production tax statutes at issue in this case. The State's argument relies on two decisions in which the Department of Revenue was a party: *Exxon Mobil Corp. v. State, Department of Revenue*[52] and *Union Oil Co. of California v. State*.[53] But neither case supports the application of reasonable basis review to the statutory interpretation question presented here.

The *Exxon* decision is not on point because we did not decide in that case how much deference to give an agency's interpretation of statute. In that case we held that a taxpayer did not have standing to dispute a Department advisory bulletin on the applicability of oil and gas production tax credits before the taxpayer's returns or payments were disputed.[54] In deciding that the dispute was not ripe, we noted the "clear benefit to the Department using its administrative expertise about the oil [and gas] production tax framework to consider issues and defend or alter its current

---

[49]     *Id.* at 98 (quoting AS 07.10.030 (1974)).

[50]     *Id.*

[51]     *Id.* at 99.

[52]     488 P.3d 951 (Alaska 2021).

[53]     804 P.2d 62 (Alaska 1990).

[54]     *Exxon Mobil Corp.*, 488 P.3d at 958-59.

interpretation in the administrative process."[55]  But we did not decide what standard of review should apply to a particular statutory interpretation question.[56]  And the decision certainly does not stand for the proposition that all questions about the interpretation of the production tax statutes are subject to deferential reasonable basis review.[57]

The *Union Oil Co.* decision is not on point either because it involved the application of technical expertise that is not relevant here.[58]  In that case we applied the reasonable basis standard to review the Department of Revenue's determination of the appropriate accounting method for a tax exemption certificate.[59]  The Department determined that a statute exempting a business from tax based "only upon its industrial development income" was intended "to focus on the source of the income, which is better done by separate accounting."[60]  The business seeking an exemption argued that exempt income should be calculated in the same manner as actual tax liability.[61]  The choice of which accounting method was more appropriate "involv[ed] policy questions within the [Department's] area of expertise that [were] inseparable from the facts underlying the [Department's] decision."[62]

By contrast, this case concerns whether the legislature intended that municipal own-use gas, which is not taxed, be treated as taxable when calculating transferable tax credits, and what the legislature meant when it provided that municipal

---

[55]  *Id.*

[56]  *See generally id.* at 955-57 (holding that advisory bulletin was not regulation for purposes of APA).

[57]  *Id.*

[58]  804 P.2d at 64-66.

[59]  *Id.* at 64 (concluding that reasonable basis review was appropriate when issue involved policy questions within State's area of expertise).

[60]  *Id.* at 65.

[61]  *Id.*

[62]  *Id.* at 64.

gas producers shall be eligible for tax credits "to the same extent" as other producers.[63] This is ultimately a question of legislative intent rather than a question of technical expertise about oil and gas, business, or accounting. And although the State emphasizes that the oil and gas production tax framework is complex, "[s]tatutory interpretation" — even of complex laws — "is within the scope of the court's special competency."[64]

Finally, this case does not involve the type of legislative delegation of fundamental policy-making authority seen in *Mobil Oil Corp. v. Local Boundary Commission*.[65] The Boundary Commission's statutory authority to determine "whether an area is cohesive and prosperous enough for local self-government involve[d] broad judgments of political and social policy."[66] And the broad statutory standards it was tasked with applying reflected "delegated legislative authority to reach basic policy decisions."[67] But here, the legislature itself determined how municipal oil and gas producers are to be treated with respect to production taxes and credits.[68] There is no indication that the legislature delegated authority to the Department of Revenue to make fundamental policy decisions on this question.

The statutory interpretation question presented here is not dependent on the agency's technical expertise, nor is it a matter of fundamental policy for the agency to decide. Rather, it requires discerning what policy the legislature itself intended when it decided the degree to which municipal entities that produce gas are eligible for tax

---

[63] Former AS 43.55.895(b) (2014).

[64] *Union Oil Co. of Cal. v. Dep't of Revenue*, 560 P.2d 21, 23 (Alaska 1977) (citing *State v. Aleut Corp.*, 541 P.2d 730, 736-37 (Alaska 1975)).

[65] 518 P.2d 92, 98-99 (Alaska 1974).

[66] *Id.* at 98.

[67] *Id.* at 99.

[68] Former AS 43.55.895 (2014).

-17- 7807

credits. Therefore, we apply the substitution of judgment standard to the statutes in question.

"The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[69] When interpreting statutes using our independent judgment, we consider the statutes' language, purpose, and legislative history.[70] "We begin with the text and its plain meaning, and we use a 'sliding-scale approach' to interpret the language."[71] Under this approach, "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be" to overcome the plain meaning of the statute's text.[72]

### 2. The statutory text is ambiguous.

There are two key points to keep in mind in this statutory interpretation problem. The first point is that tax obligations and tax credits are both calculated by reference to the value of oil and gas "taxable under AS 43.55.011(e)."[73] This point, by itself, tends to support the Municipality's argument. Because its own-use gas is not

---

[69] *Roberge v. ASRC Constr. Holding Co.*, 503 P.3d 102, 104 (Alaska 2022) (quoting *Murphy v. Fairbanks N. Star Borough*, 494 P.3d 556, 563 (Alaska 2021)).

[70] *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003).

[71] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019).

[72] *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016) (quoting *Adamson v. Mun. of Anchorage*, 333 P.3d 5, 11 (Alaska 2014)).

[73] Former AS 43.55.011(e) (2014) (levying production tax by multiplying production tax value by set percentage); AS 43.55.165(e)(18) (2014) (calculating "haircut" for tax credits by reference to "total taxable production"); AS 43.55.023(b) (2014) (calculating carried forward annual loss credit by reference to "production tax values"); AS 43.55.160(a)(1) (2014) (defining production tax value by reference to value of oil and gas "taxable under AS 43.55.011(e)").

taxable when calculating the taxes it owes,[74] the Municipality argues that it should not be counted as taxable when calculating its tax credits.

The second point is that the production tax statutes have specific rules for municipal gas producers, set forth in AS 43.55.895. Subsection (a) contains a special tax rule for municipalities. It expressly taxes only gas sold to other entities; gas produced and used by a municipality, such as for a utility it owns, is not taxed. Subsection (b) provides that municipal gas producers are eligible for tax credits "to the same extent as any other producer." What it means to award tax credits to municipalities "to the same extent" as other producers, given municipalities' unique tax obligations, is at the heart of the parties' dispute.

The Municipality's position is that because its own-use gas is not actually taxed, it should not be considered "taxable" when calculating its tax credits. According to this theory, AS 43.55.895 creates a special rule for municipal producers about what gas is "taxable," and this rule applied the same way to determine both tax obligations and tax credits. In other words, the Municipality reads "eligible for all tax credits . . . to the same extent as any other producer" to mean that its credits should have been calculated based on the volume of gas that is actually taxable — just like other producers.

This approach, in practice, grants the Municipality uniquely generous tax credits. Because the Municipality sold less than one percent of the gas it produced during the tax years in question, its taxable production was low. The Municipality then sought to deduct qualifying expenses it incurred for all of the gas it produced. This yielded a large carried forward annual loss credit. And the "haircut" for its qualified

---

[74]     As explained above, it is not taxable because under AS 29.71.030 (2014), tax may be assessed against a municipality only if a statute expressly provides for it, and the statute levying production taxes, AS 43.55.011 (2014), does not expressly apply to municipalities. It is AS 43.55.895(a) (2014) that expressly taxes gas that municipalities sell to other entities.

capital and lease expenditure credits was also quite low (again yielding large credits) because it was calculated as a percentage of the small portion of its production that was "taxable," rather than as a percentage of its total gas production. Under the Municipality's interpretation, it could claim far larger tax credits than a non-municipal entity producing the same amount of gas and incurring the same expenses to produce that gas. That is because such a small proportion of the Municipality's gas is "taxable," whereas 100% of a non-municipal producer's gas is taxable. This anomalous result leads us to question whether this is how the legislature intended the statute to work.[75]

The State's position is that a municipality's own-use gas is not "taxable" when determining its tax obligations, but it must be treated as "taxable" when calculating tax credits. According to this theory, AS 43.55.895(a) creates a special rule about what gas is "taxable" for determining municipal producers' tax obligations. But AS 43.55.895(b)'s proviso that municipal producers are eligible for credits "to the same extent as any other producer" should be understood to impose the general rule that applies to other producers when calculating credits. That is, a municipal producer's tax credits must be calculated by reference to the types of gas that are "taxable under AS 43.55.011(e)" itself[76] — not by reference to the special rule in AS 43.55.895(a), which applies only to municipal entities. Because AS 43.55.011(e), by its own terms,

---

[75] *See Murphy v. Fairbanks N. Star Borough*, 494 P.3d 556, 564 n.42 (Alaska 2021) ("[E]ven when a statute's language meaning seems plain on its face, ambiguity may arise if applying that meaning would yield anomalous consequences." (citing *Fed. Deposit Ins. Corp. v. Laidlaw Transit, Inc.*, 21 P.3d 344, 351 (Alaska 2001))).

[76] As explained above, AS 43.055.011(e) (2014) levies production tax on "the producer for all oil and gas produced each calendar year . . . less any oil and gas the ownership or right to which is exempt from taxation or constitutes a landowner's royalty interest." The phrase "ownership or right to which is exempt from taxation" is defined under AS 43.55.900(19) (2014) as "any ownership interest of the federal government or the state."

levies a tax on all gas produced except gas that is a landowner's royalty interest or is owned by the state or federal government, the State argues that all gas produced by the Municipality should be deemed taxable when calculating tax credits.

From the statutory text alone, it is not clear which approach the legislature intended. Because municipal gas producers are subject to special tax treatment by virtue of AS 29.71.030 and AS 43.55.895(a), it is not entirely straightforward what the legislature meant by making municipal entities eligible for tax credits "to the same extent as any other producer." Did it mean that their tax credits should be calculated based on the amount of their gas production that is actually "taxable under AS 43.55.011(e)"? Or did it mean that their tax credits should be calculated based on the gas that AS 43.55.011(e) describes as taxable? These two things are the same for most producers, but not for municipal entities. So it is not possible to treat a municipal entity completely the same as other producers when calculating tax credits.

The Municipality emphasizes, repeatedly, that its own-use gas cannot be taxed, was not taxed, and so was not "taxable under AS 43.55.011(e)." The Municipality's interpretation has the virtue of simplicity.

But this apparent simplicity glosses over the fact that the Municipality's version of being treated the same as other producers starts with it being treated differently. The Municipality's interpretation would apply AS 43.55.895(a)'s special rule limiting what municipal gas is taxable not only when calculating tax, but also when awarding credits. To put it another way, the Municipality argues that making it eligible for tax credits "to the same extent as any other producer" meant calculating its credits on the basis of statutes giving it a unique tax status. But it seems at least as plausible to think that by making municipal entities eligible for tax credits "to the same extent as any other producer," the legislature intended that municipal entities' special tax status should *not* play a role in determining their tax credits.

The Municipality also maintains that if its tax credits were not calculated based on the value of gas that can actually be taxed under AS 43.55.011(e), then it was

not being treated the same as other producers, whose credits were calculated according to that value. This may be true, but the point is not decisive. As we have just explained, because a municipal gas producer has a unique tax status, it is not possible to calculate its tax credits in identical fashion to the credits of other producers. Neither the Municipality's interpretation nor the State's interpretation results in a municipal entity's tax credit calculations being identical to other producers' in all respects.

Because we cannot discern, from the text alone, what the legislature intended, we turn to the legislative history and what it reveals about the purpose of these statutory provisions.

### 3. Legislative history, statutory purpose, and the canon of strict construction suggest that municipal own-use gas should be treated as "taxable under AS 43.55.011(e)" when calculating tax credits.

The legislative history of AS 43.55.895 points in the State's favor. This history suggests that the legislature did not intend for municipal gas producers to receive disproportionately favorable tax credits due to their unique tax status.

The legislature enacted AS 43.55.895 in 2007.[77] Early versions of the bill did not authorize municipalities to receive tax credit certificates.[78] A proposed amendment and emails discussing the proposed amendment in the record created before the ALJ in this case indicate that representatives of the Municipality sought to introduce an amendment that would have provided that a municipal entity "subject to taxes because of this section is eligible for tax credits under this chapter." According to these documents, the State sought to introduce a slightly different amendment providing that municipal entities would be eligible for tax credits "to the same extent as any other

---

[77]    Ch. 1, § 1, SSSLA 2007.

[78]    H.B. 2001, § 31, 25th Leg., 2d Special Sess. (Oct. 18, 2007) (amending AS 43.55.023 to provide that "[a]n entity that is exempt from taxation under this chapter may not apply for a transferable tax credit certificate").

producer." The amendment ultimately adopted contains the language favored by the State.[79] Comparison of the two proposals supports an inference that "to the same extent" was intended to act as a limit on municipal eligibility for tax credits.

A statement made by the amendment's sponsor also supports this interpretation:

> [T]his amendment addresses an issue that dealt, inartfully, in the original bill with municipal entities. . . . [I]t brings clarity to the liability for production taxes of municipal entities who are producers of gas or oil. And under the amendment, and consistent with a Supreme Court ruling, municipal entities are not liable for taxes and surcharges, nor eligible for credits for production of oil or gas they use in house. *But also under this amendment, municipal entities are liable for taxes and eligible for credits for production of oil and gas that is then sold to another party, just as any other producer would be.*[80]

The sponsor's statement suggests an intent that the credits for municipalities be calculated so that municipalities did not receive disproportionate tax treatment as a result of using gas in-house.

It must be noted that the sponsor's statement does not correctly describe how the statute actually works. The statement implies that eligibility for tax credits depends on selling gas, but as the Municipality points out in its brief, that is not the case. Entities can be eligible for tax credits even if they sell no gas.[81] In fact, the less

---

[79] Senate Committee Substitute for Committee Substitute for H.B. 2001 (FIN), § 64, 25th Leg. 2d Special Sess. (Nov. 15, 2007).

[80] Hearing on H.B. 2001 Before the S. Fin. Comm., 25th Leg., 2d Special Sess., 9:43-9:44 p.m (Nov. 14, 2007) (statement of Senator Kim Elton) (emphasis added).

[81] Credits available under AS 43.55.023(a) (2014), AS 43.55.023(b) (2014), and AS 43.55.023(*l*)(1) (2014) are available to both producers and explorers that incur expenditures in exploring for new oil or gas reserves.

gas they sell, the greater tax credit they are likely to receive, because tax credits are inversely related to "production tax value."[82]

Yet the statement's imprecision does not muffle the clearly expressed intent that municipal entities not receive uniquely generous tax credits as a result of the gas they use in-house. That sentiment tends to support the State's interpretation of "to the same extent as any other producer": a municipal producer's tax credits are to be calculated based on the general rule of what gas is taxable, rather than the special rule applicable to municipal producers only.

The State's interpretation also seems to better align with the underlying purpose of the production tax credits themselves.[83] Before the carried forward annual loss credit was adopted, former Tax Division Director Robynn Wilson stated to the Senate Finance Committee that the purpose of this credit was to address "if you're in a loss position — i.e., your expenditures exceed your production tax value — you end up with a net loss."[84] According to the State, a producer should only be eligible for the carried forward annual loss credit under a net-value tax system when it incurs a loss — i.e., when it spends more than the value of what it produces. But the Municipality did not experience a loss in the tax years at issue. The value of its non-royalty production (over \$36 million in each year) exceeded its lease expenditures. Therefore, an interpretation of a municipal entity's eligibility for tax credits that allows it to claim sizable tax credits when the value of its production exceeds its expenditures does not

---

[82]    *See* former AS 43.55.023(a)(1) (2014); AS 43.55.023(b) (2014); AS 43.55.023(*l*)(1) (2014); AS 43.55.160 (2014); AS 43.55.165(e) (2014).

[83]    We interpret a statute's text in light of its overall purpose. *See, e.g.*, *Cent. Recycling Servs., Inc. v. Mun. of Anchorage*, 389 P.3d 54, 57 (Alaska 2017); *City of Valdez v. State*, 372 P.3d 240, 254 (Alaska 2016).

[84]    Hearing on H.B. 3001 Before the S. Special Comm. on Nat. Gas Dev., 24th Leg., 3d Special Sess. at 3:45 p.m. (Aug. 9, 2006) (statements of Robynn Wilson, Tax Division, Dep't of Revenue).

align with what the legislature intended by making municipalities eligible for credits "to the same extent as any other producer."

The Municipality's alternative reading of this legislative history is not persuasive. Noting that Director Wilson used the statutory term "production tax value" when describing the "net loss," the Municipality asserts that her use of a term with a "specific statutory meaning" indicates legislative intent that the credit must be calculated according to the "the value of taxable gas . . . whatever it might be." In other words, the Municipality suggests that the legislature must have intended the credit to apply to its own circumstances, even though it did not suffer an actual loss. But it seems much more likely that Director Wilson's reference to net losses reflected an intent to credit real losses — when expenditures exceed value produced — and not paper "losses" due to the Municipality's unique tax status.

In a similar vein, legislative history suggests that the haircut was enacted to prevent producers from claiming large capital expenditure tax credits for the costs of replacing aging facilities.[85] Under the Municipality's interpretation, a municipal entity producing the same amount of gas and incurring the same expenditures as a non-municipal entity would receive a far larger tax credit than the non-municipal entity. The Municipality's more generous tax credit would bear no relation to the statutory purpose of ensuring that tax credits reward investments in new production. In response to this point the Municipality essentially shrugs its shoulders, maintaining that the haircut is a "very blunt instrument." That may be so, but we are still inclined to favor an interpretation that aligns with statutory purpose over one that has no relation to it.[86]

---

[85]     *See* Hearing on H.B. 3001, S. Special Comm. on Nat. Gas Dev., 24th Leg., 3d Special Sess., 11:45-11:58 (Aug. 9, 2006) (statements of Dr. Pedro Van Meurs, Consultant to the Governor).

[86]     *Cent. Recycling Servs., Inc.*, 389 P.3d at 57 ("[W]henever possible, we construe a statute in light of its purpose." (quoting *Alaskans for a Common*

"Taxpayer exemptions are strictly construed against the taxpayer and in favor of the taxing authority."[87] This canon of construction "is an aid to, not a substitute for statutory interpretation."[88] In this case the canon helps resolve any lingering ambiguity about what the legislature intended by making municipal producers eligible for tax credits "to the same extent as any other producer." A narrower construction of this phrase is the one that treats municipal own-use gas as "taxable" when calculating tax credits, avoiding outsized credits that bear no relation to the underlying purposes of the tax credit scheme.

Because we agree with the State's interpretation of the relevant statutes, we affirm its decision partially rejecting the tax credits sought by the Municipality.[89]

## B. The Agency's Statutory Interpretation Was Not A Regulation That Required Formal Rulemaking.

Whether the State's decision is invalid under the APA depends on whether the statutory interpretation underlying the decision constituted an administrative

---

*Language, Inc. v. Kritz*, 170 P.3d 183, 192-93 (Alaska 2007))); *Murphy v. Fairbanks N. Star Borough*, 494 P.3d 556, 564 (Alaska 2021) ("[W]hen construing a statute, we must, whenever possible, interpret each part or section of a statute with every other part or section, so as to create a harmonious whole." (alteration in original) (quoting *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1127 (Alaska 2017))).

[87] *Ketchikan Gateway Borough v. Ketchikan Indian Corp.*, 75 P.3d 1042, 1045 (Alaska 2003) (citing *Sisters of Providence in Wash., Inc. v. Mun. of Anchorage*, 672 P.2d 446, 447 (Alaska 1983)).

[88] *Sisters of Providence in Wash., Inc.*, 672 P.2d at 447 (quoting *McKee v. Evans*, 490 P.2d 1226, 1230 n.18 (Alaska 1971)).

[89] The State raises two alternative arguments for affirming the agency decision. First, the State argues that the Department's denial of additional tax credits could be affirmed by prorating the Municipality's lease expenditures. Second, the State argues that the decision could be affirmed through the "economic substance doctrine," under which the State claims the Municipality's small gas sale could be disregarded because the sale lacked economic substance and had little to no practical economic effect. Because we conclude that the State correctly interpreted the tax credit statutes, we do not reach these alternative arguments.

regulation that required formal rulemaking. The APA "establish[es] basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations."[90] The required procedures include public notice of a proposed action,[91] opportunity for public comment,[92] and recordkeeping.[93] If a regulation is not adopted in accordance with these rulemaking procedures, it is invalid.[94]

The APA's definition of "regulation" is broad,[95] but we have held that not all agency interpretations of statute are regulations that require rulemaking.[96] "[A]gencies must have some freedom to apply relevant statutes without the burden of adopting a regulation each time they do so."[97]  "Requiring that every agency

---

**90**    AS 44.62.280 ("It is the purpose of AS 44.62.180-44.62.290 to establish basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations.").

**91**    AS 44.62.190; AS 44.62.200.

**92**    AS 44.62.210.

**93**    AS 44.62.215.

**94**    *See* AS 44.62.300(a)(1); *see also, e.g.*, *Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542, 548-49 (Alaska 2012).

**95**    AS 44.62.640(a)(3) defines regulation as:

> [E]very rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency.

**96**    *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 36 (Alaska 2016).

**97**    *Stefano v. State, Dep't of Corr.*, 539 P.3d 497, 502 (Alaska 2023) (alteration in original) (quoting *Chevron*, 387 P.3d at 36).

interpretation of governing law 'be preceded by rulemaking would result in complete ossification of the regulatory state.' "[98]

"[A]n agency's interpretation of an existing statute . . . requires rulemaking if it adds requirements of substance, is unforeseeable, or changes the agency's approach."[99] "Whether an agency action is a regulation is a question of law that does not involve agency expertise, which we review applying our independent judgment."[100]

The Municipality argues that the interpretation of the tax credit statutes adopted in the Department's decision constituted a regulation that required rulemaking because the interpretation was expansive and unforeseeable. The Municipality also argues that the decision reflects a change in the Department's previous interpretation because it differs from Director Alper's description of the statute in testimony before the legislature. We address each argument in turn.

### 1. The agency's decision was not expansive and reflects a foreseeable interpretation of an ambiguous statute according to its own terms.

An agency's interpretation of a statute may be a regulation that requires rulemaking if it "add[s] specific criteria or values that clarif[y] the existing statutory or regulatory standard and requires the public to comport with precise criteria not specified in existing rules."[101] By contrast, "agencies do not need to promulgate regulations when

---

[98] *Stefano*, 539 P.3d at 520 (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1086 (Alaska 2011)).

[99] *AVCG, LLC v. State, Dep't of Nat. Res.*, 527 P.3d 272, 280 (Alaska 2023) (citing *Chevron*, 387 P.3d at 36-37).

[100] *Id.*

[101] *Chevron*, 387 P.3d at 37.

they merely apply an existing statutory or regulatory standard to the facts before them."[102]

The Municipality argues that the informal conference decision upholding the State's credit calculations is a significant expansion of the plain terms of AS 43.55.011(e) and AS 43.55.895. The Municipality also argues that the interpretation is unforeseeable, pointing to Director Alper's assertion that a "literal interpretation" of the statute would make municipal gas producers eligible for significant credits despite producing substantial amounts of gas.

The Department's interpretation of the tax credits was neither expansive nor unforeseeable. As discussed above, the Department's interpretation of the municipal tax credits is the most persuasive interpretation of the statutes at issue when reading the production tax scheme as a whole and viewing AS 43.55.895 as a set of rules for the special case of municipal entities that produce oil and gas. Because the Department's interpretation is the most persuasive interpretation of the statute, it cannot be expansive or unforeseeable.

### 2. The agency's decision did not change its previous interpretation of the statute.

The Municipality also asserts that the Department's decision reflected a change in its interpretation of the statute, departing from the interpretation described by Director Alper before the legislature. Therefore, the Municipality argues, this "new"

---

[102]     *AVCG, LLC*, 527 P.3d at 282. *Compare Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 242-44 & n.40 (Alaska 2003) (holding that agency's determination that regulation governing "major energy facilities" did not apply to airport expansion was "common sense interpretation of the regulation's applicability"), *and Alyeska Pipeline Serv. Co. v. State, Dep't of Env't Conservation*, 145 P.3d 561, 563, 573 (Alaska 2006) (concluding that agency deciding whether certain costs were recoupable from regulated party did not constitute a regulation), *with Jerrel v. State, Dep't of Nat. Res.*, 999 P.2d 143-44 (Alaska 2000) (holding that adding specific, inflexible requirements to a rule constituted a regulation that required rulemaking procedures).

interpretation was invalid because it was not adopted through rulemaking. We are not persuaded that Director Alper's testimony amounts to an official interpretation of statute that the Department was bound to follow until changed through formal rulemaking.

After the Municipality applied for tax-year 2014 credits but before it applied for tax-year 2015 credits, the State introduced legislation proposing to amend AS 43.55.895(b).[103] The amendment limited a municipal entity's tax credit eligibility so that it would be eligible for "credits proportionate to its production taxable under AS 43.55.011(e)."[104]

In support of this legislation, Director Alper described the example of a "municipal utility":

> If a utility owns gas production, say, and is burning it themselves in their own turbines and supplying their own customers, their own citizens, that's fine. That's not really a taxable event. But what happens if they have a little bit of surplus production and they sell it to a third party, let's just say. Well, again, a literal interpretation of the law says they can take that tiny amount of revenue that comes from selling one or two percent of their production and offset all of their expenses against it for the purposes of calculating certain credits and certain benefits. And that's one of those things that the lawyers say, "Nope, that's what it says," and we say, "Well I don't think that's what it's supposed to say." So we're going to try to clean that up in one of the sort of secondary features of the legislation before you.[105]

Director Alper made similar comments in other exchanges with legislators, discussing the difficulty of "dealing with literal interpretations of law issues" and describing the

---

[103] H.B. 247, §37, 29th Leg., 2d Sess. (Jan. 19, 2016).

[104] *Id.*

[105] Hearing on H.B. 247 Before the House Res. Standing Comm., 29th Leg., 2d Sess. at 2:36 p.m. (Feb. 3, 2016) (testimony of Ken Alper, Director, Tax Division, Dep't of Revenue).

issue of gas producers claiming lease expenditures based on their total gas production as a "somewhat unreasonable and unintended consequence of a literal interpretation of statute."[106]  In a written exhibit provided to members of the legislature, the Department stated that in the case of a municipal utility, "[c]urrent law allows all lease expenditures to be used to offset the comparably small amount of sales, potentially generating large credits."

Based on these statements, the Municipality argues that the Department previously interpreted the statutes in a way that supports the Municipality's claimed credits and could not change this interpretation without rulemaking.  To support this argument the Municipality cites our decisions in *Chevron U.S.A., Inc. v. State, Department of Revenue*[107] and *Stefano v. State, Department of Corrections*.[108]

In *Chevron* we rejected the argument that the Department of Revenue violated the APA when it adopted an interpretation of the statutory term "economically interdependent" that differed from a position articulated in internal deliberative documents.[109]  We recognized that these internal documents "were never meant to represent [the Department's] official policy position[]" on the statute.[110]  Therefore, the official decision, which reached a different conclusion about the meaning of "economically interdependent," "d[id] not represent a change in official policy that

---

[106]     Hearing on H.B. 247 Before the House Res. Standing Comm., 29th Leg., 2d Sess. at 8:34 am (Feb. 25, 2016) (testimony of Ken Alper, Director, Tax Division, Dep't of Revenue).

[107]     387 P.3d 25 (Alaska 2016).

[108]     539 P.3d 497 (Alaska 2023).

[109]     387 P.3d at 39-41.

[110]     *Id.* at 40.

requires rulemaking because the internal documents never purported to set forth [the Department's] official position."[111]

In *Stefano* we ruled that the Department of Corrections violated the APA when it changed its interpretation of a prisoner's "firm release date" for furlough purposes.[112] In 2019 the agency published an official memorandum describing how a prisoner's "firm release date" would be calculated.[113] In 2021 it announced a new interpretation via email and then applied the new interpretation to calculate prisoners' furlough dates.[114] "There [wa]s no question that the Department changed its interpretation of 'firm release date' as a change in official policy, so formal rulemaking was required."[115]

Although the circumstances of this case are somewhat unique, they seem closer to *Chevron* than to *Stefano* for two reasons.

First, Director Alper's statements to the legislature were not presented as "official policy" the way the interpretation of "firm release date" in *Stefano* was. In many, though not all, of his statements, Director Alper mentions the "literal" interpretation of the statute, implying that this was not the true or intended meaning of the statute. His testimony does not convey the certitude of official policy like the memos in *Stefano*.

And although Director Alper's statements were not deliberative or internal like the memos in *Chevron*, we have similar misgivings about treating them as statements of official policy. In *Chevron* we reasoned that treating internal documents as prior official positions that could be reversed only through rulemaking would

---

[111] *Id.*

[112] *Stefano*, 539 P.3d at 503-05.

[113] *Id.* at 500-01.

[114] *Id.*

[115] *Id.* at 503.

"dissuade agency officials from conducting important internal written analyses and examining policy issues from all sides."[116] Treating Director Alper's testimony as the agency's official interpretation of statute would raise similar concerns. Agency officials might be dissuaded from candidly describing ambiguity in statutory text when interacting with legislators if their statements will be treated as pronouncements of official policy in later adjudications.

In some cases the statements of an agency's top official in sworn testimony to the legislature might well be sufficient to induce reliance. We noted in *Stefano* that "[t]he need for rulemaking when an interpretation changes . . . rests on the APA's statutory purpose of providing adequate notice to regulated parties."[117] "The notice requirement allows 'members of the public sufficient information to decide whether their interests could be affected by the agency action and thus whether to make their views known to the agency.' "[118] It also "gives potentially regulated parties a chance to conform their actions to the agency's expectations."[119] Allowing the agency to change its position without formal rulemaking could create real unfairness for the regulated public.

But these risks are not present here. The transactions underlying the Municipality's tax credit claims all occurred before Director Alper's testimony. And the Municipality's first application for tax credits was submitted before this testimony

---

[116] 387 P.3d at 40.

[117] 539 P.3d at 502.

[118] *Id.* (quoting *State v. First Nat'l Bank of Anchorage*, 660 P.2d 406, 425 (Alaska 1982)).

[119] *Id.* (citing *AVCG, LLC v. State, Dep't of Nat. Res.*, 527 P.3d 272, 286 (Alaska 2023)); *id.* at 502 n.28 ("Applying standards that already exist does not require formal rulemaking because . . . . [p]ast decisions provide regulated entities with notice of the agency's expectations . . . ." (alteration in original) (quoting *AVCG, LLC*, 527 P.3d at 286)).

as well. Thus, the Municipality cannot claim that it structured its affairs in reliance on Director Alper's testimony as statements of the official policy.

Second, there is no indication that the "literal interpretation" Director Alper described had been applied to any case or entity. In *Stefano* both the prior interpretation of "firm release date" and the updated interpretation had been applied to determine inmates' release dates.[120] But in *Chevron* we deemed it significant that the oil producers challenging the Department's decision as a change in official policy "fail[ed] to cite or describe earlier decisions addressing" the statutory term, "much less demonstrate how [the Department's] [d]ecision was inconsistent with precedent."[121] As in *Chevron*, the Municipality has not pointed to any administrative actions or decisions in which the Department has calculated tax credits according to the Municipality's interpretation of the statutes.

If a particular reading of a statute has never been announced as official policy and has never been applied in official proceedings, then applying a different reading does not truly amount to a change.[122]

Finally, the Municipality argues that the legislature's subsequent revision of AS 43.55.895(b) proves that the statute previously meant what the Municipality argued. This does not follow. "An amendment of an unambiguous statute is generally presumed to indicate a substantive change in the law. Where the original statute is ambiguous, however, a change may be regarded as a legislative interpretation or clarification of the pre-existing law."[123] We have acknowledged the ambiguity in AS 43.55.895(b). The legislature's clarification of the law does not indicate that the Municipality's position on the tax credit calculation was correct all along. Nor does the

---

[120] *Id.* at 500-01.

[121] 387 P.3d at 41.

[122] *See id.* at 40-41.

[123] *City of Anchorage v. Thomas*, 624 P.2d 271, 273 (Alaska 1981).

statute's modification suggest that the Department shared the Municipality's position prior to the legislature's clarification. Accordingly, the Department's decision to deny the Municipality's claimed tax credits did not entail a changed official interpretation of statute that could be made only through rulemaking. We affirm the superior court's rejection of the Municipality's APA claim.

## IV. CONCLUSION

For the foregoing reason, the superior court's judgment is AFFIRMED.